Filed 1/14/16 opinion on remand from Supreme Court

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MARVIN DOUGLAS JOHNSON, JR.,<br><br>     Defendant and Appellant. | A136120<br><br>(Mendocino County<br>Super. Ct. No.<br>SCUKCRCR111825902) |
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>SIMON THORNTON<br><br>     Defendant and Appellant. | A136124<br><br>(Mendocino County<br>Super. Ct. No.<br>SCUKCRCR1118259<br>SCUKCRCR1015191) |

**INTRODUCTION**

On July 20, 2011, a car sped into a campsite at Lake Mendocino at about 60 miles an hour and skidded to a stop. Four men got out of the car: defendant Marvin Johnson, defendant Simon Thornton, AJ Schnebly and William (Buck) Crocker. Crocker, wearing a red bandana that covered his face from the nose down, ran towards the group at the campsite, and with a gun in his hand, shouted for everybody to get down on the ground. Within minutes, Joe Litteral, who had been staying at the campsite, was shot to death and Brandon Haggett, another visitor, was shot and seriously wounded. It was stipulated at trial that a fingerprint lifted from the shotgun later collected in evidence belonged to Crocker, and it was undisputed at trial that defendants Johnson and Thornton, who were

1

tried jointly, were not the shooters. Johnson and Thornton were tried on three counts: murder, attempted murder, and attempted kidnapping. The murder charge was based on two theories: first degree felony murder in connection with attempted robbery or attempted kidnapping, and second degree murder based on aiding and abetting another who acted with malice aforethought. Johnson and Thornton were convicted of first degree murder and attempted murder, and were acquitted of attempted kidnapping.

The defendants appealed, contending that (1) the trial court erred in instructing the jury pursuant to CALCRIM No. 335 that they were accomplices as a matter of law; and (2) the court erred in instructing the jury pursuant to CALCRIM No. 548 that the jury did not have to unanimously agree on a theory of murder. Johnson separately contended that the court erred in giving an instruction regarding voluntary intoxication pursuant to CALCRIM No. 404. Thornton separately argued that he was denied effective assistance of counsel and cumulative error compelled reversal. We held that the trial court erred in instructing the jury that it did not have to unanimously agree on a theory of murder where, as here, one theory of murder was first degree murder and the other theory was second degree murder, and that this error was prejudicial. We therefore conditionally reversed the first degree murder convictions and remanded the case to permit the district attorney to retry the cases or to accept a reduction of the murder convictions to second degree murder. We found the remaining grounds for appeal without merit.

The California Supreme Court granted the defendants' petitions for review and transferred the case back to this court with directions to vacate our prior opinion and reconsider the matter in light of the recently issued *People v. Banks* (2015) 61 Cal.4th 788, 809-810 (*Banks*).) The specific page references in the Supreme Court's order focused our reconsideration on a point relevant to our discussion of implied malice as a theory underlying the defendants' murder convictions. As we will explain, we conclude that *Banks* does not apply to the issue presented here, and no change in our disposition of the case is necessary.

2

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2011, Johnson and his wife, Deborah Cano, were homeless and living on the "outside" in a field in a tent in Mendocino County. They had a 12-year, troubled relationship that Cano described as "ups and downs, abusive, controlling." Johnson hit, beat and threatened her on many occasions and was also verbally and emotionally abusive. She was afraid of Johnson and many times tried to leave him. When she left he would send people to find her, or he would look for her himself. She could never get very far away from him, and "[s]o I never really had any out, no way out." They sometimes lived in Nebraska where she had family, but would regularly return to California, where they were frequently homeless.

According to Cano, Johnson was doing drugs and drinking and would be gone for several days at a time. In July 2011, Cano decided to get away from him. Initially, she went to AJ Schnebly's house. She didn't stay with Schnebly, however, because he was Johnson's friend and that made her feel unsafe. She "took off walking" until she ran into Joe Litteral, who was also homeless. She and Johnson had hung out with Litteral in the past; he was an "acquaintance that became a friend." According to Cano, Litteral and Johnson had a good relationship.

Litteral offered to take Cano to the Pine Cone Motel where he had a room. A lot of people were in and out of the motel, and three or four people spent the night in Litteral's room. Cano didn't leave the room because she didn't feel safe. After she arrived, Johnson sent Schnebly and two other people to check on her.

The next day Cano, still at the Pine Cone Motel, overheard Johnson and a friend of Litteral's named Brandon Haggett on the phone. Johnson was yelling at Haggett and she overheard Johnson saying, "I am going to kill you. I am going to come there and I am going to kill you." He said this two or three times.[1]

---

[1] Jennifer Wood testified that while she was visiting her friends at the Pine Cone Motel, she met Deborah Cano, who she understood was breaking up with her husband. On one occasion, she heard Johnson yell, "I am going to kick your ass, Joe. I want my wife back."

Cano and the other people who were staying with her and Litteral at the Pine Cone Motel decided to go to the Bu-Shay campground at Lake Mendocino. Cano estimated that there were at least nine people at the campground, including two children. Brandon Haggett and Joe Litteral were among this group.

The day after they arrived, Johnson came up over the ridge "yelling and screaming." He sent two or three people into the campground ahead of him. Cano didn't know them by name, but was familiar with them. Cano didn't speak with Johnson directly. Instead, she went inside her tent. Johnson stayed at the campsite into the evening hours eating, talking, smoking marijuana and drinking with, among others, Litteral and Haggett.

Toward the end of the evening, Johnson approached her. He said things like "I am going to get you. I am going to get you back. I know I am going to get you, and you better watch what you are doing. You better not have them do anything, and if I see you doing anything, I'm going to hurt somebody." Cano testified that Johnson said "if he seen me with Joe Litteral" in a romantic way "he was going to hurt us." After Johnson left, Litteral told her that she should stay in the tent with him because "we're not going to let nobody scare us."

Johnson went to the campsite next to theirs, where six or seven other people were staying. He stayed the night. The next morning he was back at Cano's campsite "talking with all the guys."

On July 20, as it was becoming evening, a car pulled up "really quick" to the tent where Cano was staying. The doors flew open. The first person Cano recognized was AJ Schnebly, who had a pistol grip shotgun in his hands. Cano didn't see anything in Johnson's hands. Schnebly racked the shotgun. Moments later, Cano saw Brandon Haggett "fighting with a guy with a handgun." This man (later identified as Crocker) was wearing a bandana over his nose and mouth. Cano heard a gunshot and saw Haggett drop to his knees.

Litteral, who was about 55 feet away, ran toward Haggett. Cano saw the man with the gun "shoot him, point blank." She heard a second shot, and testified "I seen Joe

4

[Litteral] go down. . . . I screamed, and I started running over there . . . ." At that point, Johnson ran toward her and grabbed at her. As he did so he yelled, "Get in the fucking car, bitch." She ran the other way towards Haggett and Litteral.

Brandon Haggett, one of the shooting victims, testified about the days that led up to the incident and the shooting itself. In July 2011, Haggett was staying at the Pine Cone Motel with his friend Joe Litteral. Cano came to stay at the motel. Over the course of Cano's first day at the motel, Haggett answered five or six calls from a man who identified himself as Cano's husband. This man, who Haggett later learned was Johnson, told Haggett, "I want her back," "[b]etter bring my wife back. I am going to kill you. I am going to find you." Johnson was "very angry, very upset." Haggett was under the impression that "he felt like we were keeping her against her will. So he was very upset with us." All of the conversations he had with Johnson contained threats of some kind, including threats to kill.

At several points, Cano spoke with Johnson on the phone. Haggett heard her yelling at Johnson, and at one point she agreed to meet Johnson to see if they could work things out.

Haggett didn't take Johnson's threats seriously because "people threaten people all the time when they are hurt. They never act on it." But because the calls were creating "a lot of strain" among the people at the motel, they decided to leave and go to a campground at Lake Mendocino.

A day after they arrived at the campground, Johnson showed up with three other people. He was yelling at his wife, and she was yelling back at him. Haggett told him "if you are looking for a fight, I am going to stop you right here because you are not bringing this into the campground." Johnson and his friends accepted Haggett's invitation to stay to eat, drink beer and smoke marijuana.

The next day, July 20, 2011, at around dinner time, a car came speeding into the campground about 60 miles an hour. The car skidded about five feet before it stopped. Four doors swung open, and four men came out. One had a shotgun and one had a .45.

Johnson came out of the right hand passenger side rear door.  Haggett did not see who came out of the driver's side.

The man with the shotgun (Schnebly) stood by the car.  The man with the .45 (later identified as Crocker) was moving toward the campground.  He was running fast, and wore a wig and a red bandana that covered his face.  There were about 15 or 20 people at the campground.  Crocker pointed the gun in the air and then moved it around in a circle toward the people at the campground and yelled "[e]verybody down on the ground."[2]  At the same time, Johnson was yelling at Cano, " 'See what we can do? Get in the car.' "

Haggett told one of the women at the camp site to " '[g]et the kids out of here.' "  Haggett then "made a split decision to protect the girls and [Litteral's] life."  He ran up to Crocker, grabbed Crocker's gun, put it to his own chest and told Crocker "to pull the trigger a couple of times."  When Crocker didn't pull the trigger, Haggett started fighting with him over the gun.  In the struggle over the gun, Crocker dropped to the ground on his back.  Haggett was on top of him, and it felt like Crocker was losing his grip on the handgun.

At that point, Haggett felt three "severe blows" to the back of his head.  It sounded like metal hitting a rock.  Haggett turned around to face the person who was hitting him.  He identified that person at trial as Thornton.  As Haggett pulled back his fist to hit Thornton, Haggett was shot point blank in the chest by Crocker.

Haggett tried to get up and saw Litteral start fighting with Thornton.  Crocker ran toward the car and then "turn[ed] back around and start[ed] firing in Joe [Litteral]'s direction."  Haggett heard three shots.

Litteral dropped to his knees, and Haggett heard him yelling, " 'Oh shit. I am dead.' "  All the men ran toward the car.  Johnson was by the car and yelled to Cano to

---

[2] Jennifer Wood testified that it was Johnson who shouted "get on the ground."

6

get into the car again.[3]  During the entire incident, Johnson stayed by the car.  When the men got in the car, Cano was over where Litteral had fallen and Johnson "made no attempt to make sure he got Deborah to leave . . . ."

Litteral bled to death from a gunshot wound that perforated his right lung.  His right arm was fractured by a blow with such significant force that there was a tremendous amount of hemorrhage around the broken bone.  The forensic pathologist believed the bone was fractured by something round and wooden that could create this amount of force and type of injury, such as a baseball bat or a bowling pin.  Haggett was shot in the left arm and is now unable to extend his fingers or move his wrist on that arm.

Schnebly's nephew, Kenny Kumpula, testified that after the shooting, Thornton told him that he had gone to Lake Mendocino with Schnebly and Crocker "[o]ver some money and a woman[,]" and "to beat some people up[.]"  Thornton also told Kumpula that "people at the lake owed him money[.]"

### Defendant Johnson's Statements to Police

Defendant Johnson gave several interviews to the police, substantial portions of which were played for the jury.  Johnson admitted he drove Schnebly, Crocker and another person to and from the camp site where the shootings took place.  He told the police that he had told "AJ and those guys" that there was "weed and cash" at the campground, and that while at "the creek" in Willits the morning of the shootings he knew that they were "going out there to rob these mother fuckers[.]"  Put another way, Johnson told the police that he knew they were going out to the campsite to "handle some shit[.]"  "I thought they were going out there to argue and fight maybe and try to get their money or whatever but not like that."  At another point he explained that everybody was "out there for the money and the weed that's out there."  He also admitted that he saw Schnebly's and Crocker's guns before they arrived at the campsite.  Johnson told the police that when he was driving the men to the campsite immediately before the

---

[3] Jennifer Wood testified that she heard Johnson yell "[g]et in the fucking car, bitch," at Cano as he was leaving the scene.

7

shootings, he "knew they were driving out there to go rob some people." Johnson related that the others told him "you're just going for the lady. We're getting all the money."

After he was arrested, Johnson took the police to the place in Potter Valley where the guns had been dumped after the shootings. He told them a bat was there too, but no bat was recovered.

### *Defendant Thornton's Phone Calls from Jail*

Thornton made three recorded phone calls from jail. He was aware he was being recorded, and spoke cryptically. In one call, Thornton spoke to "Justin," and told him that "there's some things out I need to get, make sure that are disposed of." He told him where to find the items in "P.V." and explained that they were in a "lot of bush." Thornton said, "When you find the stuff— . . . [¶] —when you find what I need disappearing, you'll know what to do." (When Thornton testified at trial, he admitted he was talking about the guns used at the incident.) In another recorded phone call, Thornton told his fiancé Tanya Thurman to tell Schnebly that "we got rid of" the thing that Thornton "wanted to get from [Schnebly]," and told her to "[t]ell [Schnebly] all of that, nothing to worry about unless somebody that was with us says something." Apparently referring to Kenny Kumpula (Schnebly's nephew and Thurman's friend, and the person whose car was borrowed so the entourage could drive to the lake on the day of the shootings), Thurman told Thornton that Kumpula "wants to know why he got lied to by his uncle and you and that he doesn't care and that anyone who lies to him is dead to him." Thornton replied, "We did it to protect him because if he knew what was really going on, it could be bad for him. And it wasn't planned to go the way it went." Kumpula was apparently in the room when Thornton made this comment, because Thurman then replied, "He just walked out of the room because he was like shaking." To which Thornton responded, "Shut your fucking trap and listen. It's because we were protecting him and the other thing is nothing went according to plan. . . . [¶] You need to go find him and tell him he, he needs to fucking make sure to keep it under wraps." When Thurman replied that she didn't know if he would, because he was so angry, Thornton replied, "It's my future." In the third phone call, again to his fiancé, Thornton

8

asked her to tell Kumpula that a "good soldier" "follows orders." Thornton told Thurman to tell Kumpula that he "was looking at the bigger picture. I was looking at making our life more comfortable. All of ours." It's apparent from the recording that as Thornton spoke Thurman was relaying his words to Kumpula.

### Defendant Thornton's Defense

Thornton testified in his own defense that on July 20, the day of the incident, he was at a "free meal place" in Willits when Schnebly, who was his friend's uncle, showed up, followed by Johnson and Crocker. Thornton testified that "[w]hile we were eating, some things were discussed, just random shoot the breeze kind of thing. Introductions to each other, introduction to people that were with us. [¶] I know that [Schnebly, Crocker] and I'm not sure but possibly Johnson . . . stepped aside at one point and had a conversation on the side. I'm not 100 percent sure though if [Johnson] did. And they came back."

At that point, "somebody" said he needed "to make a trip" and Thornton was asked to go along with them. Thornton wanted to join them: "[W]hy not. It's just a joyride as far as I'm concerned." He also wanted Schnebly to like him.

Schnebly called Kenny Kumpula to use his car, and soon the four men got into the car and left town. Johnson drove. On the way, Crocker "wanted to stop by the place where he was staying to grab a backpack. So we did that. . . . [H]e came out with a green . . . Jansport backpack, it might have been a duffel bag." Crocker put the backpack into the trunk of the car. Thornton was under the impression from what the other people in the car were saying that they were going to Ukiah.

However, "at some point a detour was made. I don't know who decided it. It was decided that we would detour and go out to Lake Mendocino. So as we're going out there at one point we pull over, the backpack was taken out of the trunk and put on the floorboard in front of [Schnebly] and we continued on our way." They stopped at the check-in booth at the campground and told the ranger that "we were just going to drop off something real quick."

They drove into the campground and "[a]t that point all I remember . . . was [Schnebly] leaned forward to his feet area where the backpack was. And he starts unzipping. I see [Crocker] put on like a mask over his face. I see [Schnebly] start assembling what looked like a shotgun. I didn't know for sure if it was a shotgun or a rifle at first because I wasn't paying attention, I was kind of—I honestly was freaking out. I was scared because all of a sudden there's a gun coming out of nowhere. Then I also saw that [Crocker] had at one point he had like a black bag . . . and I saw him at some point unzip that and there was a gun in there, there was some clips and ammunition."

Thornton had just met Crocker that day, and had met Johnson once or twice before, casually at the homeless shelter. He had only known Schnebly for about a week and a half.

A lot of thoughts ran through Thornton's head, including the possibility that the men were going to hurt him or Johnson. He did know "at one point when we were heading toward Ukiah that we were detouring for that purpose [picking up Johnson's wife] but I didn't know what the point of the guns were . . . . Why do you need guns to go pick somebody up?" He did not "know if she wanted to go willingly or I was not informed of that. I assumed that it was willingly."

They "proceeded to go up into the campground. At one point they stopped. [Schnebly] opens the door to [the] passenger front seat and gets out with the shotgun across his body. . . . As he's doing that, [Crocker] got out behind him . . . ." Defendant Johnson "[j]ust sat in the driver seat driving, scared pretty much as much as I was from the look of him." Thornton testified that at some point, Johnson may have "stood up outside the car," but he went no further than that.

"And so then all of a sudden I hear arguing, and I'm still in the car, and I look over from the car and I see [Crocker] arguing with . . . Brandon Haggett. And I hear arguing and 'shoot me, shoot me,' being yelled at him by Haggett towards [Crocker] and then somebody else came up, who I didn't know it was at the time, with what it almost looked like a baseball bat but I guess was a tree branch. . . . [A]nd he proceeded to try to whack

[Crocker] with it." He thought Crocker was hit two or three times with the tree branch. He then heard gunshots and saw Haggett fall to the ground and then Litteral fall.

Thornton testified that all this time he was in the car, "freaking out." He "didn't expect guns to be showing up, you know, I didn't know what the hell we were doing. I was just going along for a ride. If I would have known then I would have never got in that car because people dying is not a cool thing."

Crocker and Schnebly got into the car, and they all left. There was an argument in the car about where to go next. Johnson wanted to get out of the car and leave, as did Thornton. Thornton didn't say anything. They went to Potter Valley to drop off the guns, and then on to Ukiah. According to Thornton, Johnson said, "I had nothing to do with this. I didn't have no reason to be involved in this. I didn't touch no gun, my hands are clean. . . ." Johnson got out of the car. Schnebly and Crocker had an argument about who would drive the car, and Thornton volunteered to take it back to Willits. On the way, Schnebly and Crocker threatened Thornton that if he said anything they would hurt him and his fiancé, who was pregnant at the time.

Thornton admitted that he made a telephone call to "Justin"—his mother's boyfriend—from jail, and that his cryptic instruction to Justin was to retrieve the guns from Potter Valley (referred to in the phone call as P.V.). Thornton tried to minimize the phrase "make them disappear" as meaning only that he was afraid that Crocker and Schnebly would go back for the weapons, and what he actually wanted was for Justin to take the guns to the police. He admitted he told his fiancé in a phone call that he did it "to make our lives more comfortable," but testified that he wasn't referring to money.

Thornton admitted that when he voluntarily spoke to the police in September while being held in jail pending trial, he told them that possibly Johnson had a bat, since Schnebly and Crocker had the only other weapons identified at the scene. At trial, he denied saying that he believed Johnson swung the bat, and tried to explain the inconsistency by stating that when he was told by police that there was a bat, he deduced it must have been Johnson's. He never saw Johnson use a bat at the scene. If he had told the police that Johnson had swung the bat and that he was afraid to talk about it because

he was afraid of Johnson, he had only done so under the influence of the medication he was taking at the time of the interview in September. In fact, he was not afraid of Johnson.

Thornton admitted he had given conflicting statements about his understanding about why they were going to the lake. At trial, he said he didn't know the intentions of the other men in the car; when he spoke to the police in September, he said he thought Johnson wanted to go to the lake to "pick up" his wife.

Thornton denied carrying a baseball bat. He explained: "I didn't carry a bat around. I carry . . . a six-foot tall galvanized steel pipe that I use for walking purposes because I have back problems. I use it as basically a hiking stick and I actually found that in the dumpster." He admitted that three or four days before the shooting he had "a confrontation with somebody and used a wooden bat and it was broken in the process." He described this bat as a small Giants memorabilia bat.

Thornton testified that although he had earlier told a police officer that he had gotten out of the car at the campground, he was wrong. He attributed this to medication he was taking at the time he spoke to the police in September. Similarly, although he had earlier told Detective Whiteaker that he saw someone destroy the bat, and that there were two bats in the car, he denied the truth of those two statements at trial, explaining again that the medication he was taking at the time made it difficult for him to understand Whiteaker's questions.

### Defendant Johnson's Defense

Lorraine Strom, Cano's mother, testified that she never witnessed nor was told by her daughter that Johnson was physically abusing her. According to Strom, her daughter is a chronic liar, something Strom believed stemmed from the fact that in her first marriage "she got hit in the head with a baseball bat" by her husband. Cano and Johnson had verbal arguments, although nothing physical.

Defendant Johnson testified in his own defense. He described his relationship with Cano. Their main problem was with "her being unfaithful . . . . She was cheating on me with my own friends . . . ." When he first met her, they were both using drugs. They

12

had frequent arguments, and although those arguments were verbally abusive, they were not physical. He described Cano as "very jealous."

Towards the middle of July, Cano left him over an incident involving a woman. Johnson went looking for Cano and learned she was with Joe Litteral and Brandon Haggett and others at the Pine Cone Motel. He went to the motel to find out whether she was planning to come back to him.

Cano told him at the motel that she wasn't going with him. She accused him of cheating on her. She wasn't crying; she was angry. Johnson went to the park and began to drink; he was a little upset. He called the motel once to speak to Cano, and she told him not to call her. He denied calling Cano more than that one time, and denied being mad at her when he called.

The next time Johnson saw Cano was at Lake Mendocino. He went there to "talk to my wife and maybe she was going to come back with me. I'm not sure. I wasn't going to make her." At first, the conversation was "heated" but ultimately, the man to whom he was speaking, Joe Litteral, invited him into the campsite. He was familiar with Litteral from running into him in Willits. Litteral told Johnson that he thought Cano needed some time away from him. Litteral said that Cano thought Johnson was cheating on her.

Johnson told Litteral it was fine; he was "kind of hurt but I wasn't going to bust a grape over it." He decided to continue trying to talk to Cano about it, so he stayed overnight at the next campsite. He heard Cano crying in the tent she was sharing with Litteral. He understood she was crying because she didn't want him to be there. He also felt that she was trying to make people feel sorry for her. He didn't go to her tent to talk to her that evening.

At the end of the evening, someone asked Johnson if he could help them get some marijuana. Johnson talked to someone at another campsite and made a deal with a man named Brackett whereby Johnson would receive $100 for every pound that was bought. At that point Johnson didn't know how big the deal would be; he anticipated he would be paid by the people who bought the marijuana.

The next morning, July 20, Johnson introduced Brackett to Litteral and a man named River to set up the marijuana deal. Johnson then left the campground and went back to Willits. He met Crocker and some other men "at the creek." At some point Schnebly showed up. The men were talking, "smoking some pot, drinking some whisky, some beer." After Schnebly said he was going to Lake Mendocino with some girls, Johnson told him that "Well, okay if you guys go up there, ask them if a weed deal went through because they owe me a couple hundred bucks." When Schnebly asked him to elaborate, Johnson told him there might be "weed and money" up there. Johnson admitted he was "drinking so I kind of, you know, blabbed a lot to him;" he was "running [his] mouth, . . . [¶] . . . talking big talk." Johnson bragged that he had set up a big marijuana deal.[4]

Schnebly left to get some food. Johnson and Crocker met up with him a little while later and also had lunch together. Schnebly was with defendant Thornton and Thornton's fiancé. Johnson had seen Thornton before but didn't know him. Johnson "noticed [Crocker] and [Schnebly] talking but [he] wasn't up close enough to know what they were saying." Afterwards Schnebly told him that their ride out to the lake had cancelled. He told Johnson he was going to borrow a car and asked Johnson if he had a drivers license. Johnson said he didn't want to go back out to the lake. He had just been there, and he wanted to stay in Willits. Schnebly said "we just want to go out and drink a lot out there and talk to these people."

Johnson said he wasn't sure and left to get some food. At this point it was about 4:30 or 5:00 p.m. Johnson assumed that while he was gone Thornton and Schnebly continued to talk about this plan. They approached him again and asked him to give them a ride. His response was "[w]ell, I guess, I could try see if my wife's ready to go home yet or not." He explained that "[u]sually after a few days of being pissed [she]

---

[4] The "deal" Johnson was bragging about involved 10 pounds of marijuana at about $700 a pound.

14

comes straggling in . . . ." Johnson's intent then was to go up to Lake Mendocino to talk to her.

He realized in "bits and pieces" what Schnebly and Crocker intended to do at the lake. When Johnson, Schnebly and Crocker went to Burger King where Schnebly's nephew Kenny Kumpula[5] had a car, he may have heard a conversation about robbing the people at the campground, but he did not quite remember because he "had quite a bit to drink that day." He thought he probably heard "bits and pieces" of what was being said. Because Johnson had a driver's license, Kenny loaned him the car. At that point, his intention was to give the three men a ride to the campsite. He knew they wanted "to do something" but he "wasn't really sure what . . . they wanted to do. Little bits and pieces were coming out but not all at once." He described the men in the car as "talking amongst themselves like back and forth mumbling and stuff like that, what was going to be going on. But I mean, I had a little inkling of what was kind of going to go on, they were going to handle something, but not for sure exactly what until we got there and everything went bad." Thornton was involved in this conversation "[b]ut not really as much as [Crocker]."

Johnson testified that he might have heard about a handgun before they went to Crocker's trailer in Willits. Crocker got out of the car, went into his trailer and got back in with a duffel bag. Johnson was "getting a little suspicious here and there off of some things that were being said . . . ." Johnson attributed his inability to remember some of the details of these events to being "a little bit drunk" that day.

When Johnson was asked why he changed his mind and agreed to drive to the campsite, he said he "was thinking on what they were going to be doing and my wife was out there I didn't want her to get hurt or whatnot." He changed his mind because of "[t]heir actions, the way they were talking." The "bits and pieces" he was hearing

---

[5] Kenny Kumpula was AJ Schnebly's nephew. Kumpula testified that he loaned his car to a man who had a driver's license, who was with his uncle on the day of the murder.

included "talk about going out there and handling some business, coming up." To him "handling some business" meant "they want to go out there [and] take whatever they were getting that I set them up with." He admitted he understood that "they were going to go out and take the stuff [he] had bragged to them about that might be up there."[6]

Even knowing this, Johnson agreed to drive the others because he "wanted to go out and try to see if I could get my wife to leave with me. And I wasn't even sure if that's what they were insinuating that they were going to do is do that. I just—I was getting bad vibes on the way going to get the car they were stopping talking to a few people on the way, and they kept on saying . . . we're going to be coming up on them." To Johnson, the phrase "coming up," meant "[t]hey're going to come up with some money and weed" when they went out to the camp site.

Although they had stopped by Crocker's trailer for a duffel bag, Johnson did not know until they were close to the lake that Crocker and Schnebly had weapons. He was worried when they were talking about "robbing," and Crocker came out with some bags.

Johnson drove the car, Schnebly sat in the front passenger seat, Crocker sat behind Schnebly, and Thornton sat behind Johnson. In the car "[n]othing straight up came out. They were—they were just like saying that they're going to [go] . . . out there and talk. Like I said, okay, I'm going to try to get my wife. And that's pretty much all I was gathering." Again, Johnson blamed his faulty memory on being "a little bit drunk" that day.

Before they arrived at the campground, Johnson pulled off the road and stopped the car. Thornton got out and took the duffel bag out of the trunk. He handed it to Schnebly and then got back in the car. Schnebly unzipped the duffel bag and started piecing together a shotgun sitting right next to Johnson in the front seat. Johnson asked him what he was doing, but still continued driving. Johnson didn't get out of the car and

---

[6] On cross-examination, Johnson again admitted that he "had a good . . . idea" that Schnebly, Crocker and Thornton intended to rob the people at the campsite. He "didn't quite know they were going to rip them off, until we . . . were actually heading out of Willits. I mean, I had a little bit of idea. Wasn't 100 percent sure."

leave because he was "kind of freaked out . . . I don't mess with guns." This was the first time Johnson realized there was a shotgun inside the bag. At that point he knew "what we're going to be doing," but he didn't want any part of it.

Johnson continued to drive through the guard gate to the campground. He told the guard he was dropping off some supplies. A short way beyond that, he stopped the car again. Crocker and Schnebly put on bandanas. Crocker also unzipped his bag and put a magazine into his gun. Johnson saw people putting clips in guns and racking a round into the shotgun.

Crocker and Schnebly told him to drive up to the campsite. Johnson agreed but "I was real hesitant on what I was wanting to do because I was just stunned." He described himself as being a little scared and a little anxious. But he knew "exactly [what] was going on at that point." He knew they were going to use the guns and maybe commit a robbery. And he kept driving them into the campground.

Johnson didn't get out of the car and run, however, but instead took them to where his wife was. He drove into the campground at a normal speed and turned the car off when they arrived.

Schnebly opened his door first, pulled out the shotgun, cocked it and said " 'Everybody on the ground.' " Crocker got out of his seat behind Schnebly and "with his handgun out . . . he started pointing it at people as he was walking." Crocker told everyone to get on the ground as well.

Johnson "got out of the car and . . . was standing with one leg in, one leg out, and was holding the door . . . I was yelling 'what the fuck? What the fuck?' " He yelled out to Cano, "get—get fucking over here and get in the fucking car." It was his intention to take Cano away as quickly as possible.

At this point, Thornton was still in the car. He got out when "[Schnebly] asked [him] to get out of the car and go help [Crocker] while [Crocker] was . . . getting jumped . . . ." "Haggett was hitting [Crocker] in the face with his fist. And Joe [Litteral] took off running with a log in his hand, going, 'Ahh,' like that, going toward them and then Joe started hitting [Crocker] and he hit him right across the bridge of his nose with a

stick. . . . [¶] And then [Schnebly] tells [Thornton] to get out of the car and go help [Crocker]. So [Thornton] got out of the car with the baseball bat, went over there and he starts swinging on Mr. Haggett and then Mr. Litteral got hit in the arm. . . . [¶] . . . That's how the log got dropped . . . [Litteral] had the log in the arm that he was swinging with and when he got hit in the arm the log fell." Johnson recalled that the bat was a beat up aluminum bat with a black piece on the handle.[7]

In the meantime, Johnson was "yelling a lot of shit out. . . . everything went so fast . . . ." His main concern was with his wife. He testified he did not leave the car and get her, however. He knew she wouldn't go with him "especially after the gun got fired." The gun was fired after "[Litteral] hit [Crocker] in the face with the log and [Crocker] went down and he was on his knee when he was pointing upward . . . ." Johnson heard the gun go off two times. Haggett "was probably on one knee from getting hit with the baseball bat." Crocker got up and Johnson "heard the gun go off . . . as [Crocker] was running away from them." Johnson thought Crocker was going to fire the gun again, but Schnebly told him to stop. Johnson restarted the car and drove off with Thornton, Schnebly and Crocker.

All the way back to Lake County, Crocker and Schnebly argued about where they were going to hide out. Johnson took them to Potter Valley and told them where to put the guns. Johnson thought Schnebly or Buck might "want to get rid of him."

Schnebly and Crocker put the guns in the bushes and Thornton threw the bat "deep into the bushes on the driver's side of the car . . . ." Johnson was dropped off in Ukiah. He told them "You guys are on your own. I'm not hiding from nobody. I'm going to walk right down the street. I didn't do nothing." He didn't go to the sheriff because he

---

[7] Johnson testified that Thornton was lying when he said he never touched a bat that day. On the way back to town, Thornton said, " 'I cracked him a couple of times.' " Johnson recalled that the bat was in Kenny Kumpula's car when they began driving and that Thornton had possession of it "[l]ike it was his weapon." He also testified that Haggett's testimony describing the fight with Crocker and Thornton was accurate.

was scared. He felt he had some responsibility for what happened because he drove the others to the campsite.

Johnson was arrested the next day. He testified that in his interviews with the police he began by minimizing his involvement altogether because he was worried about "snitching" and what would happen to him and his family. Ultimately, however, he claimed he told the police the truth about what happened.

Johnson testified he did not intend to aid Schnebly and Crocker in the robbery. He stated that he "didn't want nothing of whatever they were doing. I didn't want no money, I didn't want no weed. I was just wanting my wife. That it was it. . . . [¶] . . . I just wanted my wife back safe. I didn't want her getting hurt."

Johnson also testified that while he was in jail he had an altercation with Thornton in which Thornton told him he was a "fucking snitch" and that he (Thornton) was going to "fucking kill you." This was not the first time Thornton had threatened him.

*Prosecution Rebuttal Case*

Deputy Steven Adams testified in the prosecution's rebuttal case that he heard Thornton yelling in the jail "You're a fucking snitch" and "I'm going to kill you." As Thornton said this, he was pointing at Johnson's cell.

In the prosecution's rebuttal case, the medical program manager at the county jail testified that as of the date of Thornton's interview with the police in September 2011, Thornton was not taking any medications.

*Verdicts*

Defendants Johnson and Thornton were convicted of first degree murder (Pen. Code, § 187, subd. (a))[8] and attempted murder (§§ 187, subd. (a), 664). The jury also found true the firearm use allegations as to both charges. (§ 12022, subd. (d).) The jury found both defendants not guilty of attempted kidnapping. Thornton had been charged with personally using a deadly and dangerous weapon ("to wit, bat") as an enhancement to each of the counts, pursuant to section 12022, subdivision (b)(1). These enhancements

_____

[8] All further undesignated statutory references are to the Penal Code.

were found not true.[9]  Johnson was sentenced to state prison for 25 years to life. Thornton was sentenced to state prison for 25 years to life, plus nine years.

## DISCUSSION

### A.  *CALCRIM No. 335—Accomplices as a Matter of Law* (*Johnson and Thornton*)

Johnson and Thornton were charged with identical crimes.  Each took the stand in his own defense and denied culpability, and each gave testimony that incriminated the other.  Johnson proposed that the court instruct the jury pursuant to CALCRIM No. 335 regarding  accomplice testimony.[10]  Thornton did not object to the court giving this instruction.

The court read the CALCRIM No. 335 instruction on accomplice testimony, modified to fit this case, as follows:

"If any of the crimes charged in this case were committed then Simon Thornton and Marvin Johnson were accomplices to that crime.

"You may not convict a defendant on any crime charged based on the statement or testimony of an accomplice alone.  You may use the statement or testimony of an accomplice to convict the defendant only if, one, . . . the accomplice's statement or testimony is supported by other evidence that you believe; two, that supporting evidence is independent of the accomplice's statement or testimony; and three, that supporting evidence tends to connect the defendant to the commission of the crime.

"Supporting evidence, however, may be slight.  It does not need to be enough by itself to prove the defendant is guilty of the charged crime, and it does not need to support every fact about which the witness testified.

---

[9] Both defendants had been charged with attempted robbery (§§ 211, 664), but this count was dismissed before trial pursuant to a section 995 motion.

[10] An accomplice is one who is "liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)  The jury was never instructed on the meaning of this term.

"On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission.

"The supporting evidence must tend to connect the defendant to the commission of the crime. The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice.

"Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in light of all the other evidence."

Thornton and Johnson now argue that the court erred in instructing the jury that they were accomplices as a matter of law.[11] They also argue that the trial court erred in not clarifying that incriminating accomplice testimony is to be treated with suspicion, but testimony that a defendant gives in his own defense is to be judged with the ordinary rules for judging the credibility of witnesses.

As a preliminary matter, we first consider the Attorney General's argument that any error with regard to the accomplice jury instructions is forfeited because Johnson proposed CALCRIM No. 335, and Thornton did not object to it. This argument is without merit.

Defendants may assert instructional error on appeal when it affects their substantial rights. (§ 1259 ["appellate court may . . . review any instruction given, refused or modified . . . if the substantial rights of the defendant were affected thereby"]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103, fn. 34 [permitting defendant to raise instructional error in accomplice instructions where defendant did not object to instruction at trial].) Further, our Supreme Court has written that "[t]he trial court's duty to fully and correctly instruct the jury on the basic principles of law relevant to the issues

---

[11] In his opening brief on appeal, Johnson did not raise the issue of accomplice jury instructions. After Thornton raised the issue in his opening brief, we granted Johnson's request to file a supplemental opening brief where he raised this issue for the first time.

21

raised by the evidence in a criminal case is so important that it cannot be nullified by defense counsel's negligent or mistaken failure to object to an erroneous instruction or the failure to request an appropriate instruction.  [Citation.]"  (*People v. Avalos* (1984) 37 Cal.3d 216, 229.)

The Attorney General also contends that because Johnson requested CALCRIM No. 335 by number and defendant Thornton did not object, any error in giving this instruction was invited.  We disagree.  " 'When a defense attorney makes a "conscious, deliberate tactical choice" to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error.' "  (*People v. McKinnon* (2011) 52 Cal.4th 610, 675.)  "The existence of some conceivable tactical purpose will not support a finding that defense counsel 'invited' an error in instructions.  The record must reflect that counsel had a deliberate tactical purpose."  (*People v. Avalos, supra,* 37 Cal.3d at p. 229.)  "Even where counsel has suggested an erroneous instruction, the doctrine of invited error is not invoked unless counsel articulated a tactical basis for the choice."  (*People v. Wickersham* (1982) 32 Cal.3d 307, 332, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.)

The record does not reflect that either defense counsel ever expressed a tactical or deliberate reason for proposing, or in the case of Thornton's counsel, not objecting to, CALCRIM No. 335.  The request from codefendant Johnson came in the form of a numeric list of jury instructions, with CALCRIM No. 335 identified solely by number.  Thornton's counsel did not object.  When the jury instructions were settled, there was no discussion as to whether CALCRIM No. 335 or another instruction on accomplice instructions (e.g., CALCRIM No. 334) was appropriate.[12]

---

[12] The pertinent discussion between counsel and the court was as follows:  The trial court stated, "The jury has left the courtroom.  I've handed out another set of instructions.  And I know you have a manslaughter instruction I want to take up.  But before we do that I want to draw your attention to some changes that I've made. . . . In the [CALCRIM] 300 series starting with 301 I had to add some language that introduces

22

The Attorney General argues that when each defendant testified, each placed blame on the other, and that this was the "obvious tactical reason[]" for requesting the instruction. Johnson repeatedly linked Thornton to holding and using a baseball bat. Thornton also sought to cast blame on Johnson by telling the police that Johnson had swung the bat during the attempted robbery, and then later destroyed it. Further, the Attorney General points out that Thornton's counsel argued in closing that the only evidence that showed Thornton was guilty of the underlying robbery were "words that Mr. Johnson spoke. That's it." From this the Attorney General concludes that the "thrust of appellant Thornton's case was essentially that the jury should view appellant Johnson's statements with 'care and caution.' " This is insufficient to show the deliberate choice necessary to find that defendants invited error by allowing the court to instruct the jury with CALCRIM No. 335.

Turning now to defendants' claim that the court erred in giving the accomplice as a matter of law instruction, our task is to determine " 'whether there is a "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel.' [Citation.]" (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370.) As we will explain, we conclude the trial court did err in giving this instruction although we also conclude that this error was not prejudicial.

The law is clear that "[w]hether a person is an accomplice is a question of fact for the jury unless the facts and the inferences to be drawn therefrom are undisputed." (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 103; accord *People v. Whisenhunt* (2008) 44 Cal.4th 174, 214.) The Bench Notes to CALCRIM No. 335 are in

---

the subject of accomplice testimony. It's the second sentence." Johnson's counsel said, "That's fine." The court then stated, "In [CALCRIM No.] 335 then, which is handwritten page 20 at the right-hand side, that is the accomplice testimony instruction. Do you have any objection?" Counsel for Johnson, counsel for Thornton, and the deputy district attorney each said "no." (The trial court was apparently referring to the handwritten page number "20" on the typed set of jury instructions, which were eventually filed and entitled "Jury Instructions Given to the Jury.")

23

accordance with this statement of the law and, in no uncertain terms, advise that a trial court should: "Give this instruction only if the court concludes that the witness is an accomplice as a matter of law or the parties agree about the witness's status as an accomplice. (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1161 [only give instruction ' "if undisputed evidence established the complicity" '], disapproved on other grounds in *People v. Cook* (2015) 60 Cal.4th 922, 939.) If there is a dispute about whether the witness is an accomplice, give CALCRIM No. 334, *Accomplice Testimony Must be Corroborated: Dispute Whether Witness Is Accomplice*."

Moreover, the CALCRIM No. 335 Bench Notes caution that "When the witness is a codefendant whose testimony includes incriminating statements, the court **should not** instruct that the witness is an accomplice as a matter of law. (*People v. Hill* (1967) 66 Cal.2d 536, 555.) Instead the court should give CALCRIM No. 334, *Accomplice Testimony Must Be Corroborated: Dispute Whether Witness Is Accomplice*, informing the jury that it must decide whether the testifying codefendant is an accomplice. In addition, the court should instruct that when the jury considers this testimony as it relates to the testifying codefendant's defense, the jury should evaluate the testimony using the general rules of credibility, but if the jury considers testimony as incriminating evidence against the non-testifying codefendant, the testimony must be corroborated and should be viewed with caution. (See *People v. Coffman and Marlow*[,*supra,*] 34 Cal.4th [at p.] 105.)" (Bolded emphasis in original.) The substance of this portion of the CALCRIM No. 335 Bench Notes is repeated in the CALCRIM No. 334 Bench Notes.

The Attorney General contends that the Bench Notes and the CALCRIM jury instructions are not themselves legal authority. This is true, as far as it goes. (See *People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7 ["jury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles in appellate opinions. At most, when they are accurate, . . . they restate the law"].)

The Attorney General also contends the case authority cited in the CALCRIM No. 335 Bench Notes does not support the proposition that, when a witness is a codefendant

24

whose testimony includes incriminating statements, the court should not instruct that the witness is an accomplice as a matter of law.  The Attorney General is referring to *People v. Hill, supra*, 66 Cal.2d 536.

In *People v. Hill*, three codefendants were tried together, but only one (Madorid) testified at trial.  Madorid's testimony constituted a "judicial confession" as to him and, "standing alone, implicated [the other codefendants] sufficiently to support their convictions if properly presented to the jury." (*People v. Hill, supra,* 66 Cal.2d at p. 555.)  The trial court instructed the jury that "if it found the crimes charged to have been committed, 'and if you further find that defendant Madorid was an accomplice . . ., then as against codefendants . . . his testimony must be corroborated.' " (*Ibid.*)  On appeal, the non-testifying defendants claimed that the trial judge erred in "instructing the jury in a manner which permitted it to conclude that Madorid was not an accomplice, and thus avoid the necessity of finding corroboration, when it appears, and the jury should have been so advised, that Madorid was an accomplice as a matter of law" since he was charged with the identical crimes, and all of the evidence placed Madorid with the other defendants at the commission of the crime.  The Supreme Court rejected this argument, holding that "where a codefendant has made a judicial confession as to crimes charged, an instruction that as a matter of law such codefendant is an accomplice of other defendants might well be construed by the jurors as imputing the confessing defendant's foregone guilt to the other defendants." (*Ibid.*)  The Attorney General argues that *People v. Hill* thus does not apply to this case because neither defendant here made a judicial confession.[13]

---

[13] The Attorney General also points to language in *People v. Hill*, *supra*, 66 Cal.2d at page 556, that "[i]t is not error even to forego the giving of accomplice instructions where the giving of them would unfairly prejudice a codefendant in the eyes of the jury," as further authority for *Hill's* inapplicability to this case.  However, this quoted language is dictum and is not consonant with later cases which state unequivocally that "[w]e have held that '[w]hen there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the

25

The facts of *People v. Hill* are different from the present case, as the testifying codefendant in *Hill* confessed to the crimes, and the codefendants argued on appeal that the trial court should have given the accomplice as a matter of law instruction. Here, both defendants denied guilt, and they now argue that giving the accomplice as a matter of law instruction was error. Nevertheless, the significance of *Hill* is the court's recognition that that jurors "might well . . . construe[]" an accomplice as a matter of law instruction in a way that could adversely affect a codefendant. By choosing not to instruct the jury that the codefendants were accomplices as a matter of law, the trial court "avoid[ed] imputations of the guilt of [codefendants] which might have flowed from the court's direction that the confessing [codefendant] was their accomplice as a matter of law." (*People v. Hill, supra,* 66 Cal.2d at pp. 555-556.) While neither of the defendants in the present case confessed, both were charged as aiders and abettors of crimes perpetrated by other individuals. Since the evidence clearly showed crimes committed by those other individuals, the instruction effectively imputed guilt to the defendants in a similar manner to that cautioned against in *Hill.*

As we have said, whether a person is an accomplice is ordinarily a question of *fact* for the jury. Here, each defendant testified, and each denied that he was guilty of the crimes charged. Put another way, there is no contention that undisputed evidence established that defendants were accomplices. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 103.) It was thus error to describe either defendant as an "accomplice as a matter of law." (*People v. Hill, supra,* 66 Cal.2d at p. 556.) The evidence simply did not support giving CALCRIM No. 335. The trial court should have used CALCRIM No. 334, which would have left to the jury the factual determination as to whether a witness

---

law of accomplices,' including the need for corroboration." (*People v. Tobias* (2001) 25 Cal.4th 327, 331.)

26

was an accomplice, and instructed at length as to how the jury was to make that determination.[14]

This error was not prejudicial, however, because it is not reasonably probable that a properly instructed jury would have found either Johnson or Thornton was not an accomplice. CALCRIM No. 334 instructs: "A person is an *accomplice* if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if: [¶] 1. He or she personally committed the crime; [¶] OR [¶] 2. He or she knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] 3. He or she intended to, and did in fact, (aid, facilitate, promote, encourage, or instigate the commission of the crime[;]/[or] participate in a criminal conspiracy to commit the crime." These requirements are essentially the same as those necessary to find a person aided and abetted commission of a crime. (CALCRIM No. 401.)[15]

---

[14] The term "accomplice" was not defined for the jury. Instead, the jury was only told about the consequences of accomplice status on corroboration and credibility. Both CALCRIM Nos. 334 and 335 are based on Penal Code section 1111, which defines accomplice for purposes of that section as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." CALCRIM No. 335 does not contain this definition. By contrast, had the jury been instructed based on CALCRIM No. 334, the jurors would have been given the definition of "accomplice" and taken through a set of factors they would first need to consider in determining whether the defendant had met his burden of proving that a witness was, in fact, more likely than not an accomplice. (CALCRIM No. 334.) As instructed here, the jury was left to its own devices to determine what accomplice meant.

[15] CALCRIM No. 401 provides in pertinent part: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's *unlawful* purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

Putting aside the testimony of either defendant against the other, there was overwhelming evidence that both Johnson and Thornton were aware Schnebly and Crocker intended to perpetrate an attempted robbery, and that defendants intended to and did in fact facilitate the attempted robbery by driving them to the campsite (in Johnson's case) and at the very least standing guard while the robbery occurred (in Johnson and Thornton's case).

Johnson admitted to the police that he told Schnebly there was "weed and cash" at the campground, that on the morning of the shootings he knew they were "going out there to rob these mother fuckers" and "handle some shit[,]" that while driving to the campsite he knew the others intended to "rob some people" and that he saw Schnebly's and Crocker's guns before they arrived at the campsite. Johnson testified that Schnebly pieced the shotgun together while sitting next to him in the front seat. Johnson continued driving and never attempted to part ways with the group. He told the guard at the campground that they were there to drop off supplies and continued driving to the campsite even after a stop during which Schnebly and Crocker put on bandanas, put a clip in the gun and racked a round into the shotgun. Additionally, prior to the shootings, while Cano was at the motel with Haggett and Litteral, Johnson had threatened to kill Haggett.

After the shootings, Thornton told Kumpula that he had gone to the campground with Schnebly and Crocker "[o]ver some money and a woman[,]" and "to beat some people up[,]" as well as that "people at the lake owed him money[.]" He told his fiancé that he and Schnebly had lied to Kumpula about why they were borrowing his car: "We did it to protect him because if he knew what was really going on, it could be bad for him. And it wasn't planned to go the way it went." Thornton told his fiancé to tell Kumpula to "keep it under wraps[,]" that a "good soldier" "follows orders" and that Thornton "was looking at the bigger picture. I was looking at making our life more comfortable. All of ours." He told his mother's boyfriend that the guns needed to be disposed of and where to find them. And Haggett identified Thornton as the person who had attacked him.

28

In light of this evidence, the defendants' testimony that they did not intend to facilitate the robbery was simply not credible. Apart from the dissonance between the claimed lack of intent and the obvious inferences arising from the above evidence, Thornton's testimony was replete with inconsistencies, and his attempt to explain away certain of his statements to the police as products of the medication he was taking at the time was contradicted by the county jail medical program manager's testimony that Thornton was not taking any medication at the time of the police interview. Johnson's argument that the evidence of the "state of his intoxication" made his version of events more credible is meritless. As we discuss more fully in section C, *post*, there was no evidence that Johnson's ingestion of alcohol and drugs on the day of the murder affected his ability to understand that Crocker intended to commit robbery or kidnapping or his ability to form an intent to aid and abet Crocker in committing the intended offenses. Johnson made no claim that his intoxication rose to that level; he only blamed his alleged inability to clearly recall *at trial* certain conversations that occurred the day of the murder on the fact that he was "just a little bit drunk, little bit" or "buzzed."

In sum, we find no reasonable probability that the jury would have found the defendants were not accomplices if it had been instructed pursuant to CALCRIM No. 334 rather than CALCRIM No. 335. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Wilkins* (2013) 56 Cal.4th 333, 351.) Once the factual question was resolved against the defendants, CALCRIM No. 334 would have directed the jury to analyze the defendants' testimony in exactly the same manner as did CALCRIM No. 335.

Defendants argue that CALCRIM No. 335 undermined their defenses by directing the jury to view their testimony with caution, and as requiring independent corroboration, without clarifying that this applied only to incriminating testimony given by each defendant against the other and not to exculpatory testimony by either defendant in support of his own defense. They rely on *People v. Coffman and Marlow, supra*, to claim the trial court erred in failing to explicitly instruct that the jury should apply the normal rules relating to witness credibility in analyzing testimony supporting the testifying defendant. But that case does not so hold. In *Coffman and Marlow*, the jury was

29

instructed on accomplice testimony given by codefendants, with the trial court drawing a distinction between types of testimony:

" 'You are to apply the general rules of credibility when weighing [defendant] Coffman's testimony in her own defense. [¶] But if you find her to be an accomplice, then in weighing her testimony against [defendant] Marlow you ought to view it with distrust. [¶] This does not mean that you may arbitrarily disregard such testimony. [¶] But give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case.' " (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 104.) The trial court then repeated the same instruction, substituting the name of the other testifying defendant. (*Ibid.*)

On appeal, the defendants in *Coffman and Marlow* challenged the distinction the trial court had drawn between "defensive and offensive testimony," and contended that the instruction was virtually impossible for the jurors to follow in that it required them to "perform the 'impossible mental gymnastic' of simultaneously distrusting (when offered against [defendant] Marlow) and not distrusting (when offered on her own behalf)." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at pp. 103-104.) The Supreme Court in *Coffman and Marlow* disagreed. "Because the evidence abundantly supported an inference that each defendant acted as an accomplice to the other, and because each testified and, to some extent, sought to blame the other for the offenses, the court was required to instruct the jury that an accomplice-defendant's testimony should be viewed with distrust to the extent it tended to incriminate the codefendant." The Supreme Court found that there was "no reason to believe this relatively straightforward task was beyond the jury's capabilities," and that it did not undermine the presumption of innocence or due process. (*Id.* at pp. 104-105.)

Although the Supreme Court approved the instruction that was given in *Coffman and Marlow*, which explicitly addressed how the jury should treat an accomplice's testimony in his or her own behalf, it did not require this instruction. In fact, the court referred to *People v. Guiuan* (1998) 18 Cal.4th 558, 569, in which it had directed that the standard accomplice testimony instruction should refer only to testimony "that tends to

30

incriminate the defendant" and instruct the jury to view an accomplice's testimony with "caution" rather than with "distrust." (*People v. Coffman and Marlow, supra,* 34 Cal.4th at pp. 104-105.) In *Guiuan*, the court explained that "[t]he word 'caution,' connoting 'care and watchfulness,' signals the need for the jury to pay special heed to *incriminating* testimony because it may be biased, but avoids the suggestion that *all* of the accomplice's testimony, including favorable testimony, is untrustworthy." (*People v. Guiuan, supra,* 18 Cal.4th at p. 569, fn. 4.) Because the accomplice testimony instructions expressly single out "incriminating" testimony to be viewed with care and caution, they do not suggest the jury must apply this standard to *all* testimony given by an accomplice.

We discern a potential for prejudice of the nature defendants suggest only if testimony by one of the defendants was at once incriminating as to the other defendant (and so to be viewed with caution and as requiring corroboration) and self-exculpatory (and so to be viewed according to the usual standards). This might have been true of the testimony regarding the assault with the bat, which Johnson attributed to Thornton and Thornton attributed to Johnson. Since each blamed the other, and only one such assault occurred, the same testimony that tended to incriminate the other defendant also tended to exonerate the testifying defendant. But, since the jury found the charges related to use of the bat as a weapon not true, neither defendant was prejudiced in this regard. The essence of each defendant's defense was that he did not intend to facilitate an attempted robbery or kidnapping, Johnson because he had independent motives for going to the campground and Thornton because he was unaware of the direct perpetrators' intent. As there was nothing in either defendant's defense of "I did not intend to do this" that could be viewed as incriminating the other defendant, nothing in CALCRIM No. 335 directed the jury to view this testimony under anything other than the usual rules for evaluating a witness's credibility.

Nothing in the record suggests that the jury in the case before us would have understood CALCRIM No. 335 to direct that they could not apply the usual rules of credibility as to each defendant. That special scrutiny was to be applied only to testimony one defendant gave against the other and was further directed by CALCRIM

31

No. 301, which instructed the jurors that a single witness's testimony was sufficient to establish any fact *except* that neither defendant could be convicted solely on the testimony of the other.[16] "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Defendants also contend that CALCRIM No. 335 amounted to an unconstitutional mandatory presumption that they aided and abetted the charged offenses—that is, that they were guilty as charged. As we have said, since CALCRIM No. 335, unlike CALCRIM No. 334, does not define the term "accomplice," and no other instruction defined it, the jury was left on its own to determine the meaning of this term. The jury was given the standard instruction that "words and phrases not specifically defined in these instructions are to be applied using their ordinary and everyday meanings" (CALCRIM No. 200), and ordinary dictionaries essentially treat "accomplice" and "abettor" as synonyms.[17] According to defendants, the jurors would have understood CALCRIM No. 335's statement that if a crime was committed, the defendants were accomplices as a matter of law, as establishing that the defendants were aiders and abettors.

---

[16] As we have noted, the jurors were also instructed pursuant to CALCRIM No. 301, as modified by the trial court, that "When considering the evidence as to each . . . defendant individually, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence. [¶] There is one exception to this rule. Neither defendant can be convicted based solely on the testimony of the other defendant."

[17] American Heritage Dictionary of the English Language defines "accomplice" as "[a]n associate in wrongdoing, especially one who *aids or abets* another in a criminal act, either as a principal or an accessory." (American Heritage Dict. of the English Language (4th ed.) p. 11, emphasis added.) Dictionary.com defines "accomplice" as "a person who knowingly helps another in a crime or wrongdoing, often as a subordinate." (http://dictionary.reference.com.) Thesaurus.com includes "aide" "abettor" and "co-conspirator" as synonyms for "accomplice." (http://www.thesaurus.com.)

We disagree. A similar argument was made and rejected in *People v. Hardy* (1992) 2 Cal.4th 86, 151-152. There, the jury was instructed that a number of witnesses were accomplices as a matter of law to the extent that crimes alleged in an information—including murder—were committed. The defendants in *Hardy* argued the witnesses were clearly accomplices and, therefore, the jury was improperly allowed to conclude that a conspiracy did, in fact, exist. The court disagreed, holding that "no reasonable juror would have so interpreted the instruction in light of the other instructions," including an instruction that the jury was required to determine as to each defendant individually whether he was a member of a conspiracy. (*Id.* at p. 151.)

The same is true here. The jury was instructed on guilt as an aider and abettor and the elements of aiding and abetting. The jury was instructed that it had to consider the evidence separately as to each defendant, and "decide whether the defendants on trial here committed the crimes charged." The jury was told that each count was a separate crime, and each was to be considered separately. Finally, the jury was repeatedly instructed on the burden of proof beyond a reasonable doubt, and told that the defendants were presumed innocent. The burden of proof was repeated in closing arguments by the prosecution and by defense counsel, and the prosecution referred to the presumption of innocence. If the jurors had understood CALCRIM No. 335 as stating that the defendants were aiders and abettors as a matter of law, all these instructions and arguments would have appeared to be irrelevant. Indeed, the entire trial would have appeared to be irrelevant, since aiding and abetting was the only theory of guilt. The term "accomplice" appeared solely in the instruction informing the jury how to view testimony given by "an accomplice" against "the defendant." A reasonable juror would have understood CALCRIM No. 335 as directing that neither defendant could be convicted solely upon the testimony of his codefendant without independent supporting evidence, and that the testimony of each defendant against the other should be viewed with "care and caution"—not that the entire trial was without purpose because the court's instruction on how to view an accomplice's testimony was really a direction to find the defendants guilty of aiding and abetting the charged offenses. "We credit jurors with intelligence

33

and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions. [Citations.]" (*People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046.) "[N]o reasonable juror would have interpreted [CALCRIM No. 335] in the manner now argued by defendants." (*People v. Hardy, supra,* 2 Cal.4th at p. 151.)

**B.     *CALCRIM No. 548 (Johnson and Thornton)***

The trial court instructed the jury that "[t]he defendants have been prosecuted for murder under two theories: (1) aiding and abetting another who acted with malice aforethought; and (2) felony murder. [¶] Each theory of murder has different requirements, and I will instruct you on both. [¶] You may not find a defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories. You do not all need to agree on the same theory." This jury instruction was based on CALCRIM No. 548.

Defendants argue that the court erred in giving this instruction. They contend that when the jurors were told that they need not "all agree on the same theory" they were misled into thinking that they need not all agree on whether defendants were guilty of first or second degree murder in reaching a verdict of murder, which is contrary to law.

In making this argument, defendants rely on *People v. Sanchez* (2013) 221 Cal.App.4th 1012 (*Sanchez*). In *Sanchez*, the victim was shot and killed in a dispute over drugs and money. Sanchez was not alleged to be the perpetrator. Instead, he was charged with murder on two distinct theories of aiding and abetting. One scenario was first degree felony murder, if he aided and abetted a kidnapping that resulted in the death of the victim. The other scenario was second degree murder, if the murder was the natural and probable consequence of an assault or kidnapping. (*Id.* at p. 1014.) At the request of the prosecution, the jury was instructed on these two theories of murder. During jury deliberation, the jurors asked a question about the definition of second degree murder. In part of its response to the question, the jurors were instructed pursuant to CALCRIM No. 548: " 'You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least

34

one of these theories. You do not all need to agree on the same theory.' " (*Id*. at p. 1019, italics omitted.)

In *Sanchez*, the majority held that because the prosecutor put forward theories that supported both degrees of murder, an instruction that the jurors did "not all need to agree on the same theory" was error because it misled the jury into thinking it need not reach a unanimous conclusion as to the degree of murder for which the defendant was liable. (*Sanchez, supra,* 221 Cal.App.4th at p. 1019.) The *Sanchez* court wrote: "Defendant contends the trial court's instruction expressly negating the need for juror unanimity as to the guilt was error. Defendant reasons the prosecution's two theories of murder supported different degrees of murder, and juror unanimity was therefore required as to the theory of guilt. If the jury followed the instruction, defendant argues that all the jurors may have agreed defendant committed murder, but it cannot be determined whether the jurors unanimously agreed defendant committed first degree murder. This is correct." (*Ibid*.) "The final instruction the jury received on unanimity was that it need not agree on the theory of guilt, even though presented with alternate theories of liability which led to different results as to the degree of murder. Unanimity was required in this case as to the theory of guilt as a result of different theories supporting different *degrees* of murder." (*Id*. at p. 1025.)[18]

In reaching its conclusion that there was prejudicial error, the court in *Sanchez* considered all of the pertinent instructions that the trial court had given. These included the trial court's instruction after closing arguments "with respect to the deliberations and the verdict forms" pursuant to CALCRIM No. 640. (*Sanchez, supra*, 221 Cal.App.4th at p. 1022 and fn. 9.) The *Sanchez* jury was told specifically that " '[a]s with all of the

---

[18] The Bench Notes to CALCRIM No. 548 were revised in August 2014. They now cite *Sanchez, supra,* 221 Cal.App.4th at page 1025, and state that the court "may need to modify the final sentence of this instruction [i.e., 'You do not all need to agree on the same theory'] if the prosecution relies on mutually exclusive theories of homicide that support different degrees of murder."

35

charges in this case, to return a verdict of guilty or not guilty on a count, you must all agree on that decision.' " (*Id.* at p. 1022, fn. 9.)

Where a defendant is charged with first degree murder, the jurors are not required to agree on "one or more of several theories proposed by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by statute." (*People v. Milan* (1973) 9 Cal.3d 185, 195.) However, the law is also clear that the jury must unanimously determine whether murder is in the first or second degree. (*People v. Jones* (2014) 230 Cal.App.4th 373, 376.) Section 1157 states in part that "[w]henever a defendant is convicted of a crime . . . which is distinguished into degrees, the jury, or the court if a jury trial is waived, must find the degree of the crime . . . of which he is guilty."

The Attorney General does not dispute these general legal propositions, or that the jury was presented with one theory of first degree murder, namely, first degree felony murder, and one theory of second degree murder, namely, malice murder.[19] Instead, the Attorney General contends that this case is distinguishable from *Sanchez* because in the circumstances of this particular case it is not reasonably likely the jury misunderstood the trial court's instructions.[20] We disagree.

---

[19] Before the trial court settled the jury instructions, the prosecutor told the trial judge, "I am not seeking first degree murder based on premeditation and deliberation. That's why I didn't submit that [jury instruction]. Just on a felony murder theory." The prosecutor also said that "there could be second degree murder in there."

[20] The jury instructions pertinent to this claim of error are as follows: The jury was instructed, pursuant to CALCRIM No. 500, that "Homicide is the killing of one human being by another. Murder is a type of homicide. The defendants are charged with murder. I will instruct you on the different types of murder." The trial court then gave the jury the instruction at issue—CALCRIM No. 548—informing them that they did not need to agree on the theory of murder.

The jury was then instructed on second degree murder, based on CALCRIM No. 520. This instruction began, "The defendants are charged in Count One with murder." It then explained the elements of murder, and the two kinds of malice aforethought (express malice and implied malice). This instruction explained the elements of implied malice, and introduced the concept of "the natural and probable consequence[] of [an] act [being]

36

The Attorney General first attempts to distinguish *Sanchez* on the ground that the jury in *Sanchez* was presented with a single theory upon which to base a first degree murder verdict, but here the jury could have found first degree felony murder based on attempted kidnapping or attempted murder. The Attorney General argues that because there were, in fact, two bases for felony murder, instructing the jury with CALCRIM No. 548 that it need not agree on which one of the two is applicable made giving this instruction appropriate. Whether there were one or two theories of felony murder is a distinction without a difference. The flaw in giving CALCRIM No. 548 was that it

dangerous to human life." It concluded, "If you find the defendant guilty of murder, it is murder of the second degree."

The jury was next instructed on felony murder. That instruction began, "The defendants are charged in Count One with murder. One theory the prosecution is relying on is felony murder." Aiding and abetting attempted kidnapping or attempted robbery were identified as the underlying felonies.

The jury was also instructed on the general principles of aiding and abetting a crime, based on CALCRIM No. 400, and the elements of proving guilt based on aiding and abetting an intended crime, based on CALCRIM No. 401.

The jury was instructed more fully on the natural and probable consequences doctrine, based on CALCRIM No. 402. This doctrine was described as another "theory" by which defendants could be guilty of murder or attempted murder. "[A]ttempted kidnapping [and] attempted robbery" were identified as the target offenses. The jury was instructed in part that a person "who is guilty of one crime may also be guilty of other crimes that were committed at the same time. [¶] Before you decide whether the defendant is guilty of murder or attempted murder under this theory, you must decide whether the defendant is guilty of attempted robbery or attempted kidnapping." The jury was instructed that "[t]o decide whether the crime of murder or attempted murder was committed, refer to those instructions I've given you on those crimes." The jury was also instructed on the elements of attempted kidnapping and attempted robbery.

The jury was also instructed generally about the need to reach a unanimous verdict. Because this case involved two defendants, the jury was instructed in the introductory instructions, based on CALCRIM No. 203, that they were to consider and decide each charge for each defendant separately, and to "return their verdict on any defendant or charge on which you have unanimously agreed." After closing arguments and before the jury was excused to deliberate, the trial court instructed the jury, based on CALCRIM No. 3550 that "[y]our verdict on each count and any special findings must be unanimous."

37

suggested to the jury that it need not agree on the *degree* of murder. The fact that the jury was not in fact required to agree on a *theory* of first degree felony murder is irrelevant.

The Attorney General also argues that because the prosecutor did not "mention" second degree murder as an "option" in his closing argument, CALCRIM No. 548 was not problematic, since it was inapplicable to the jury's deliberations. We do not find this argument persuasive. The jury was given a verdict form for second degree murder and it was instructed on the law as it pertained to second degree murder. The prosecutor told the jury in closing argument that murder starts out as second degree murder and discussed implied malice, which pertains to second degree murder and not to felony murder. The instruction, therefore, was relevant to the jury's deliberations.

The Attorney General points out that the version of CALCRIM No. 520 given to the jury in this case (see fn. 22, *post*) differed from the version before the *Sanchez* jury. (*Sanchez, supra,* 221 Cal.App.4th at pp. 1023-1024.) Here, the jury was told that "If you find the defendant guilty of murder, it is murder of the second degree."[21] The Attorney General sees this instruction as having expressly advised the jury that if it found appellants committed murder, it had to find second degree murder unless the prosecution proved first degree murder. But even assuming the jury shared this understanding, it is difficult to see how this instruction cured the error in giving CALCRIM No. 548, which essentially told the jury it need not reach a unanimous decision as to the degree of murder. The Attorney General also attempts to distinguish *Sanchez* because the jury there inquired about the definition of second degree murder, indicating that they were confused on the issue. However, the Attorney General cites no requirement that a jury inquiry need be made before a jury instruction can be found to have been given in error. Finally, the Attorney General notes that in *Sanchez* the trial court made an additional error not present here by misinstructing the jury on malice. The additional error in

_____

[21] The corresponding portion of CALCRIM No. 520 as given in *Sanchez* stated, " 'If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree.' " (*Sanchez, supra,* 221 Cal.App.4th at p. 1024.)

38

*Sanchez* does not take away from the fact that CALCRIM No. 548 was an erroneous statement of the law as applied to that case and to the present case.[22]

We now turn to the question of remedy. In *Sanchez*, the court set forth the applicable standard: " 'When the jury is "misinstructed on an element of the offense . . . reversal . . . is required unless we are able to conclude that the error was harmless beyond a reasonable doubt." [Citations.]' [Citation.] Our Supreme Court has explained that instructional error is harmless beyond a reasonable doubt in situations in which both proper and improper theories of guilt are presented to the jury, if other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the finding necessary for malice. (*People v. Chun* (2009) 45 Cal.4th 1172, 1204-1205 [(*Chun*)].)" (*Sanchez, supra,* 221 Cal.App.4th at pp. 1026-1027.)

The *Sanchez* court found that there were no " 'other aspects of the verdict or the evidence' " in that case to "indicate the jurors unanimously found defendant committed first degree felony murder." (*Sanchez, supra,* 221 Cal.App.4th at p. 1027.) It concluded that "[t]he instruction advising the jury that unanimity was not required as to the theory of guilt was therefore prejudicial error as to the finding of first degree murder." (*Ibid.*) However, because the error affected only the *degree* of murder, it held that the "proper remedy is to reverse the conviction of first degree murder and remand the cause to the trial court with directions to allow the prosecution to either retry the case or accept a reduction of the offense to second degree murder." (*Ibid.*)

The parties argue this remedy should not be employed here, the Attorney General maintaining that any error was harmless and the defendants arguing that their first degree murder convictions must be reversed without conditions. Having reconsidered our analysis of this question in light of *Banks, supra,* 61 Cal.4th 788, we disagree with the defendants' position.

---

[22] The additional instructional error in *Sanchez* was in defendant's favor, since it "overstated the prosecution's burden under the natural and probable consequences doctrine," by requiring the defendant himself, rather than the actual killer, to have harbored malice. (*Sanchez, supra*, 221 Cal.App.4th at p. 1026.)

As in *Sanchez,* in the present case there are "no 'other aspects of the verdict or the evidence' in this case to indicate the jurors unanimously found [Johnson and Thornton each] committed first degree felony murder[,]" the error was prejudicial as to the finding of first degree murder. (*Sanchez, supra,* 221 Cal.App.4th at p. 1027.)

Also as in *Sanchez,* this error in the present case only affected the question of degree of the murder. The court in *Sanchez* concluded that conditional reversal was appropriate because "[a]ssuming some jurors relied on felony murder and others on the natural and probable consequences doctrine, we hold that all 12 jurors found the elements of malice aforethought necessary for second degree murder." (*Sanchez, supra*, 221 Cal.App.4th at pp. 1027-1028.) First, the court found that any jurors who voted guilty based on the felony murder theory necessarily found malice. The court reasoned that "[a] verdict based on murder during the course of a kidnapping . . . was a murder committed with malice, which supports a minimum finding of second degree murder" because simple kidnapping " 'has been held to be a felony inherently dangerous to human life which may support a conviction of second degree felony murder [citation],' " and the felony-murder rule " ' "imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life." [Citation.]' (*Chun, supra,* 45 Cal.4th at p. 1184[.])" (*Sanchez, supra,* 221 Cal.App.4th at p. 1028.) With respect to the natural and probable consequences theory, since the trial court had instructed that second degree murder required either express or implied malice, "any juror who may have voted for guilt under the natural and probable consequences theory also found malice." (*Ibid.*) On the facts of *Sanchez*, "[g]iven the nature of the killing—an apparent execution related to a large drug trafficking organization—the existence of malice sufficient for second degree murder on the part of the actual killer cannot be disputed." (*Id.* at p. 1026.)

Johnson takes issue with *Sanchez,* as we understand his argument, for equating the imputed malice underlying a felony murder verdict with a factual finding of implied malice. Absent reliance on the felony murder doctrine, implied malice is demonstrated where the defendant performs " ' "an act, the natural consequences of which are

40

dangerous to life" ' " and "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' " (*Chun, supra,* 45 Cal.4th at p. 1181, quoting *People v. Patterson* (1989) 49 Cal.3d 615, 626.) *Sanchez,* Johnson argues, ignores the fact that a juror finding guilt based on felony murder did not have to consider whether the facts showed the defendant acted with conscious disregard for life. While the facts in *Sanchez* might support a conclusion that any juror who found felony murder based on the kidnapping in that case necessarily believed the defendant acted with conscious disregard for human life, Johnson maintains this cannot be said here because there was evidence that he had independent motives in going to the campground and did not act with such conscious disregard.

Johnson is incorrect in stating that the jury was required to find that he acted with conscious disregard for human life in order to convict him of implied malice murder. Johnson was convicted as an aider and abettor of the murder and attempted murder committed directly by Crocker and Schnebly. While "[t]he actual perpetrator must have whatever mental state is required for each crime charged," the requirement for an aider and abettor is to " 'act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' (*People v. Beeman* (1984) 35 Cal.3d 547, 560 (*Beeman*), emphasis omitted.)' " (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 (*Mendoza*).) " '[A] defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 261, quoting *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.) "The natural and probable consequences doctrine 'allows an aider and abettor to be convicted of murder, without malice, even where the target offense is not an inherently dangerous felony.' " (*Sanchez, supra,* 221 Cal.App.4th at p. 1026, quoting *People v. Culuko* (2000) 78 Cal.App.4th 307, 322.)

41

"Therefore, when a particular aiding and abetting case triggers application of the 'natural and probable consequences' doctrine, the *Beeman* test applies, and the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*People v. Prettyman, supra,* 14 Cal.4th at p. 262, fn. omitted.)

Here, to convict under the implied malice theory, the jury would have had to find that the defendants knew Crocker and Schnebly intended to commit an attempted robbery or attempted kidnapping; that the defendants intended to encourage or facilitate the target offense and in fact aided, promoted or encouraged commission of that offense; and that Crocker and/or Schnebly committed a murder and attempted murder that were a natural and probable consequence of the target offense. This would have entailed findings that Crocker and/or Schnebly—not the defendants—knew their conduct " ' "endanger[ed] the life of another and . . . act[ed] with a conscious disregard for life." ' " (*Chun, supra,* 45 Cal.4th at p. 1181.)

Defendants rely upon *Banks, supra,* 61 Cal.4th 788 to argue that the remedy of conditional reversal employed in *Sanchez* is inappropriate here because the record does not support a conclusion that the jury necessarily found they acted with the required subjective mental state for implied malice murder. We disagree with their analysis of *Banks.* First, contrary to the defendants' understanding, the mental state at issue in *Banks* is not "virtually identical" to the one at issue here. Second, the defendants' analysis ignores the distinction, for purposes of criminal liability, between the mental state required for an aider and abettor as opposed to the direct perpetrator of the offense.

*Banks* addressed the circumstances required for an accomplice who lacks intent to kill to be statutorily eligible for the death penalty (or life imprisonment without parole),

holding that these penalties may be imposed upon felony-murderers who did not personally kill "only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions."[23] (*Banks, supra,* 61 Cal.4th at p. 794.) To be eligible for the death penalty, the defendant must be a " 'major participant' " (*id.* at p. 798, quoting § 190.2, subd. (d)) in the crime and "must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Id.* at p. 801.)

In *Banks,* Matthews was the getaway driver for an armed robbery in which codefendant Banks shot one of the robbery victims. (*Banks, supra,* 61 Cal.4th at p. 794.) There was no evidence that Matthews played a role in planning the robbery or obtaining weapons, or that he or the other participants had previously committed murder, attempted murder or another violent crime; he was not at the scene; and there was no evidence he saw or heard the shooting, had a role in instigating it or could have prevented it. (*Id.* at p. 805.) In these circumstances, Matthews's conduct did not amount to major participation in the offense; he was "no more than a getaway driver." (*Id.* at p. 805.) With regard to his mental state, although there was evidence he knew he was participating in an armed robbery, "nothing at trial supported the conclusion beyond a reasonable doubt that Matthews knew his own actions would involve a grave risk of death." (*Id.* at p. 807.) Consequently, although guilty of felony murder as an accomplice to the robbery, he was not eligible for the death penalty.

---

[23] Section 190.2, subdivision (d), provides that "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

Defendants argue that the mental state discussed in *Banks*, "reckless indifference to human life," is "virtually identical" to the one at issue in the present case, "conscious disregard for human life." According to *Banks,* one acts with "reckless indifference to human life" when one " ' "knowingly engage[s] in criminal activities known to carry a *grave risk of death*" ' " and is "aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the *significant risk of death* his or her actions create." (*Banks, supra,* 61 Cal.4th at pp. 800-801, emphasis added.) Conscious disregard for human life, the mental state required for implied malice, "requires a defendant's awareness of engaging in conduct that *endangers the life of another*—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143, emphasis added.) Implied malice does *not* require "a defendant's awareness that his or her conduct had a *high probability* of resulting in death." (*Ibid.*) If implied malice does not require a defendant's subjective awareness that his or her conduct has a high probability of resulting in death, but only an awareness that it endangers life, it surely does not require a subjective awareness that the conduct poses a "grave" risk of death. Thus, consistent with the principle that only the most culpable may be subjected to the death penalty (*Banks, supra,* 61 Cal.4th at p. 797), the "reckless indifference to life" necessary for death penalty eligibility requires subjective awareness of a higher degree of risk than the "conscious disregard for human life" required for conviction of second degree murder based on implied malice.

In emphasizing the *Banks* court's focus on the requirement that an aider and abettor of murder have a subjective awareness of the grave risk of death posed by his conduct, the defendants in the present case ignore the fact that *Banks* was concerned not with criminal liability but with the state of mind necessary to render the aider and abettor eligible for the death penalty or life imprisonment without parole. The critical point in *Banks* was that eligibility for these extreme punishments required something more than criminal liability under the felony murder rule—a measure of *personal* responsibility

demanded for sentencing.[24] The *Banks* court did not address the mental state required for implied malice murder and nothing in its analysis suggests any change to the proof necessary to *convict* an aider and abettor of murder.

Here, as in *Sanchez*, any jurors who found the defendants guilty under the natural and probable consequences theory necessarily found malice: The instructions on second degree murder, the only theory presented other than felony murder, required a finding of either express or implied malice. The critical question is whether jurors who found the defendants guilty of felony murder necessarily found the facts required for a conviction of second degree implied malice murder.

*Sanchez* concluded that all 12 jurors unanimously found the malice necessary for second degree murder because, in addition to those who made the requisite factual findings for implied malice, any who found guilt based on the felony murder rule "found" malice by virtue of that rule imputing malice. The defendants are correct, in the abstract, that this reasoning ignores the fact that jurors finding felony murder did not have to make factual determinations concerning the defendants' awareness of and disregard for danger to human life. But, as we have said, this is the mental state required for the direct perpetrator, not the aider-and-abettor defendant. As to the perpetrator, *Sanchez* noted, "[g]iven the nature of the killing—an apparent execution related to a large drug trafficking organization—the existence of malice sufficient for second degree murder on

---

[24] As the court explained, "in capital cases above all, punishment must accord with individual culpability. States may 'make aiders and abettors equally responsible, as a matter of law, with principals, or . . . enact felony-murder statutes' that make individual involvement in an underlying crime enough to hold a nonkiller liable for first degree murder. (*Lockett v. Ohio* (1978) 438 U.S. 586, 602.) However, 'the definition of crimes generally has not been thought automatically to dictate what should be the proper penalty.' (*Ibid.*) When it comes time to determine a proportionate punishment, the Constitution requires more: 'an individualized decision is essential in capital cases.' (*Lockett,* at p. 605 . . . .) A sentencing body must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime. (See *Tison* [*v. Arizona* (1987) 481 U.S. 137,] 158 . . . ; *Enmund* [*v. Florida* (1982) 458 U.S. 782,] 798 . . . .)" (*Banks, supra,* 61 Cal.4th at p. 801.)

the part of the actual killer cannot be disputed." (*Sanchez, supra,* 221 Cal.App.4th at p. 1026.)

Here, all the jurors necessarily found that the direct perpetrators committed an attempted robbery. The jury could not have found the defendants guilty as aiders and abettors under either theory—felony murder or natural and probable consequences—without finding that the perpetrators committed one of the target offenses (attempted robbery or attempted kidnapping). The jury was instructed that before deciding whether a defendant was guilty of murder or attempted murder as an aider and abettor, it had to decide whether the defendant was guilty of attempted robbery or attempted kidnapping. Since the jury found the defendants not guilty of attempted kidnapping, and the defendants could be convicted of aiding and abetting the murder only if they intended to and in fact aided commission of the crime the perpetrators intended to commit, the jury must have viewed robbery as the target offense.

As in *Sanchez*, it is clear that the direct perpetrators of the murder in the present case acted with the malice required for second degree implied malice murder. Attempted robbery, in the abstract, is an " 'inherently dangerous' " offense, as demonstrated by its inclusion among the felonies supporting a first degree felony murder conviction. (*Banks, supra,* 61 Cal.4th at p. 810; § 189.) While this fact does not necessarily mean a given participant in a given robbery was aware his or her act was dangerous to human life and acted with conscious disregard for human life (*Banks, supra,* 61 Cal.4th at p. 810),[25] it does point to the foreseeability, from an objective standpoint, of danger to life. Here, Schnebly and Crocker went to the campground armed with a shotgun and a handgun; they loaded the weapons on the way, covered their faces with bandanas before arriving, and emerged from the car at the campground pointing their weapons and yelling for people to get on the ground. On these facts, "the existence of malice sufficient for second

---

[25] *Banks* noted that the dangerousness of a certain category of crime does not address whether a given participant in such a crime acted with reckless indifference to human life so as to be eligible for the death penalty. (*Banks, supra,* 61 Cal.4th at p. 810.)

46

degree murder on the part of the actual killer cannot be disputed." (*Sanchez, supra,* 221 Cal.App.4th at p. 1026.)  Under a second degree implied malice theory, the defendants' convictions rest not on their own conscious disregard for human life, which is not required, but on their aiding and abetting of an attempted robbery in which the direct perpetrators acted with implied malice.  Accordingly, having found the defendants aided and abetted Crocker and Schnebly's attempted robbery, all 12 jurors, whether relying on a theory of felony murder or a theory of implied malice murder, found the requisite malice to support convictions of second degree murder.[26]

We conclude that the matter should be remanded to the trial court.  The prosecution may elect to retry the defendants, or allow a conviction of murder in the second degree to be entered against them.

**C.      *CALCRIM No. 404 (Johnson)***

Johnson requested a jury instruction on voluntary intoxication by simply listing "CALCRIM 404" on defendant's proposed instructions filed with the trial court.  The court gave the following instruction pursuant to CALCRIM No. 404:  "If you conclude that defendant Marvin Johnson was intoxicated at the time of the alleged crime, you may consider this evidence in deciding whether the defendant: 1. Knew that Buck Crocker intended to commit murder or attempted murder [¶] AND [¶] 2. Intended to aid and abet Buck Crocker in committing murder or attempted murder.  [¶] Someone is intoxicated if

_____

[26] The appropriateness of the remedy employed in *Sanchez* is, if anything, even more clear here than it was in *Sanchez* itself.  There, the court believed jurors might have been induced to find the defendant guilty of first degree felony murder because the trial court's instructions on second degree murder erroneously required the jury to find the defendant (rather than the perpetrator) acted with malice; this definition was inconsistent with the prosecution's theory of aiding and abetting and therefore left the jury "with a choice of first degree murder by default." (*Sanchez, supra,* 221 Cal.App.4th at p. 1026.) The potential distinction between the theories of murder was particularly significant because only one of the two target offenses, kidnapping, would have supported a verdict of first degree felony murder; the other target offense, assault, could support only second degree implied malice murder.  (*Id.* at p. 1019.)  In the present case, the target offense underlying both theories is the same.

47

he or she took any drug, drink, or other substance that caused an intoxicating effect." The court also instructed the jury "Do not consider evidence of intoxication in deciding *whether attempted kidnapping or attempted robbery is a natural and probable consequence of murder or attempted murder*." (Emphasis added.) In this last sentence, the court reversed the offenses of murder and attempted murder with the target offenses of kidnapping and robbery.[27] No one objected to this obvious error, nor did Johnson object to (or even comment on) the scope of the intoxication instruction as a whole.

Johnson now argues that the trial court erred in two ways in giving this instruction. First, the instruction was incomplete because it failed to instruct the jury that it could consider whether voluntary intoxication affected Johnson's knowledge that Crocker intended to commit robbery and kidnapping, and Johnson's requisite intent to aid and abet the attempted robbery and attempted kidnapping—issues which underlay the first degree felony murder charge. Johnson argues that, as instructed, the jury was told only how it could consider the effect of intoxication in connection with forming the intent for second degree malice murder.[28] Second, Johnson contends that the last sentence of the jury instruction was completely garbled and made no legal sense. The last sentence should have read: "[d]o not consider evidence of intoxication in deciding whether *murder or attempted murder* is a natural and probable consequence of *attempted robbery or*

---

[27] When the trial court instructed the jury on the natural and probable consequences doctrine, immediately prior to instructing on intoxication, it correctly stated the relationship between the offenses: "To prove that a defendant is guilty of murder or attempted murder, under this theory, the People must prove that: . . . [¶] [3]. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of *murder or attempted murder* was a natural and probable consequence of the commission of the *attempted kidnapping or attempted robbery*.") (Emphasis added.)

[28] To be comprehensive, the instruction should have included additional language to the effect that the jury could consider evidence of Johnson's intoxication in deciding whether Johnson "[k]new that Buck Crocker intended to commit *attempted robbery or attempted kidnapping*" and "[i]ntended to aid and abet Buck Crocker in committing *attempted robbery or attempted kidnapping*."

*attempted kidnapping.*"  (CALCRIM No. 404, emphasis added.)  There was no question as to the target offense and the non-target offense; the instruction, likely through a word processing error, just got it backwards.  Johnson thus claims that he was deprived of the benefit of the intoxication instruction.

The Attorney General contends that Johnson's claim that CALCRIM No. 404 is incomplete was waived because Johnson failed to request a modification of CALCRIM No. 404 to include an instruction regarding requisite intent to aid and abet the attempted robbery and kidnapping underlying the felony murder.  We nevertheless address the underlying issue in the event the failure to request a modification of the instruction gives rise to an ineffective assistance of counsel argument.

A defendant may present evidence of intoxication on the question whether he is liable for criminal acts as an aider and abettor.  (*Mendoza*, *supra*, 18 Cal.4th at p. 1133.)  However, "[o]nce a jury finds a defendant did knowingly and intentionally aid and abet a criminal act, intoxication evidence is irrelevant to the *extent* of the criminal liability.  A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime. . . . [¶] We also stress that although evidence of intoxication is admissible on the question of aider and abettor liability, a jury can still find an intoxicated person guilty as an aider and abettor.  Evidence of intoxication, while legally *relevant*, may be factually unconvincing. . . ."  (*Id.* at pp. 1133-1134.)

"If the court gives any instruction at all on the relevance of intoxication (see *People v. Castillo* [(1997)] 16 Cal.4th [1009,] 1014 [no sua sponte duty to instruct on intoxication]), it might simply instruct that the jury may consider intoxication in determining whether a defendant tried as an aider and abettor had the required mental state.  It might also instruct that the intoxication evidence is irrelevant on the question whether a charged crime was a natural and probable consequence of the target crime.  The court would not additionally be required to parse out those elements of each crime

49

charged for which the evidence could be considered or distinguish between the knowledge and the intent requirements." (*Mendoza, supra*, 18 Cal.4th at p. 1134.)

Our Supreme Court has further written in *Mendoza* that "The applicable legal standards are settled. . . . [A] trial court has no sua sponte duty to instruct on the relevance of intoxication, but if it does so instruct . . . it has to do so correctly. [Citation.] The appellate court should review the instructions as a whole to determine whether it is 'reasonably likely the jury misconstrued the instructions as precluding it from considering' the intoxication evidence in deciding aiding and abetting liability. [Citation.] Any error would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error: 'the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant.' (*People v. Humphrey* [(1996)] 13 Cal.4th [1073,] 1089.)" (*Mendoza, supra*, 18 Cal.4th at pp. 1134-1135.)

Viewing the instructions as a whole, it is not reasonably likely the jury believed it was precluded from considering intoxication evidence. The jury was instructed on felony murder, including that the jury had to first find that Johnson aided and abetted an attempted kidnapping or an attempted murder in order to be found guilty of felony murder. The jury was instructed on "aiding and abetting," including that the jury had to find that the defendant "knew that the perpetrator intended to commit the crime" and "intended to aid and abet the perpetrator in committing the crime." The jury was also told that it was to consider all of the instructions together as a whole. Even if the intoxication instruction was incomplete, it did not inform the jurors that they were precluded from considering evidence of intoxication in connection with the knowledge and intent required for aiding and abetting felony murder. Nor did counsel make any such suggestion; the issue of voluntary intoxication was never even addressed by the prosecutor in closing.

As to the garbled last sentence of the jury instruction on intoxication, any error was harmless. It did not preclude the jury from considering relevant intoxication evidence. It was an attempt to instruct the jurors that they couldn't consider intoxication

50

on whether one crime was a natural and probable consequence of the other, because such instruction would not be relevant. (*Mendoza*, *supra*, 18 Cal.4th at p. 1134.) Because the instruction was garbled, it failed in that regard. But it did not "have the effect of excluding defense evidence," and was not error. (*Ibid.*; *see People v. Letner and Tobin* (2010) 50 Cal.4th 99, 187 [even if instructions on voluntary intoxication were inadequate, error harmless where, among other things, prosecutor did not argue that jury could not consider voluntary intoxication and defendants did not "actually argue[] a voluntary intoxication defense to the jury"].)

Finally, the asserted errors were not prejudicial because there was no evidence that Johnson's ingestion of alcohol and drugs on the day of the murder affected his ability to understand that Crocker intended to commit robbery or kidnapping, or his ability to form an intent to aid and abet Crocker in committing robbery or kidnapping.

As we have discussed, before lunch on the day of the shootings, Johnson was "down at the creek" drinking beer, whisky and smoking marijuana. He described this as getting "a buzz on." Johnson testified that the most significant effect of his intoxication was that it led him to brag about the possibility that there was a great deal of money and marijuana at the campsite. Further, he sometimes blamed his alleged inability to clearly recall *at trial* certain conversations that occurred the day of the shootings on the fact that he was "just a little bit drunk, little bit"[29] or "buzzed."[30]

---

[29] On direct examination, Johnson's attorney asked him about a specific conversation between Schnebly and Thornton in the car on the way to the lake after Crocker picked up the duffel bag with the weapons. Johnson was asked whether Schnebly and Thornton were "talking about what was going to happen up there, anything like that?" Johnson testified, "Nothing straight up came out. They were—they were just like saying that they're going to—we're going to go out the lake. We're just going out there and talk. Like I said, okay, I'm going to try to get my wife. And that's pretty much all I was gathering. I mean, I was just a little bit drunk, little bit, so I really can't quite remember exactly what was being talked about because I was drinking some whisky that day." If anything, Johnson attempted to minimize his drinking, as he did generally with his involvement in the crimes.

However, neither Johnson nor any other witness testified that Johnson's drinking and drug use made him unable to understand Crocker's intentions. Nor is there any evidence that because of drinking or drug use Johnson was unable to form an intent to aid and abet Crocker. Far from attributing his ignorance of Crocker's intentions to alcohol or drug use, Johnson testified that he did not put together what was happening because he was only given information in "bits and pieces." Moreover, Johnson admitted on several occasions that he was aware that Crocker and Schnebly were going out to the lake "for the money and the weed."

Defense counsel did not argue to the jury that Johnson's capacity to understand the events was affected because he was intoxicated. At most, defense counsel argued that Johnson displayed bad judgment in drinking and then bragging about the money and drugs at the campground.

In light of the paucity of evidence that Johnson's drug and alcohol use earlier in the day had any impact on his ability to understand there was a plan afoot to rob the people at the campsite or to aid and abet this plan, and the record described above, any error in giving this instruction was not prejudicial.[31]

---

[30] Johnson testified that when he mentioned to Schnebly, Crocker, and Cory (the other man who was with them that afternoon) that there was money and marijuana at the Lake Mendocino campsite he had been "drinking. I was—I was talking about, you know, what was out there and everything, you know. I—I talk a lot when I drink." At that point, he probably had "a 12-pack and a fifth of whisky. We were halfway tanked." He was drinking because he wanted to "cop a buzz . . . ." He was also smoking marijuana and had a "buzz on." He described himself as "quite toasted" that day. On another occasion during his testimony he described this conversation as one in which he "had a little bit too much to drink" and so "said a little too much." Finally, he also acknowledged that he set the action in motion by bragging about the marijuana and money at the campsite. He attributed that to having "a big mouth when I was drinking . . . ."

[31] Johnson argues that this instructional error rose to the level of a due process violation and, therefore, we must consider whether this error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 23-24. We need not answer this question because even under the *Chapman* standard we find no prejudice.

**D.** *Effective Assistance of Counsel (Johnson and Thornton)*

Both Johnson and Thornton argue that to the extent we find that any claimed error was waived, such a waiver occurred through ineffective assistance of counsel. Having made no such finding, we need not reach this issue.

**E.** *Cumulative Error (Thornton)*

Given our conclusion that the defendants' convictions must be conditionally reversed, Thornton's claim of cumulative error adds nothing to this appeal. The error in the accomplice instructions was harmless, and Thornton's only other claim of error, ineffective assistance of counsel, is moot since we did not find any of the claimed errors waived.

## DISPOSITION

Johnson and Thornton's first degree murder convictions are reversed and the matter is remanded for a new trial on count 1 of the Information. Unless the prosecution brings each defendant to trial within the period prescribed by law after the remittitur in this case issues, the trial court shall proceed as though the judgment on appeal had been reduced on count 1 to second degree murder for each defendant. In all other respects, the judgments are affirmed.

_____
Miller, J.

We concur:


_____
Kline, P.J.


_____
Stewart, J.

Trial Court:  Superior Court of Mendocino County

Trial Judge:  Hon. Ann Moorman

Attorney for Defendant and Appellant
Marvin Douglas Johnson, Jr.

Mark David Greenberg
By appointment of the Court of Appeal


Attorney for Defendant and Appellant
Simon Thornton

Kyle Gee
By appointment of the Court of Appeal


Attorney for Plaintiff and Respondent
People

Kamala D. Harris
Attorney General
Dane R. Gillette
Chief Assistant Attorney General
Gerald A. Engler
Senior Assistant Attorney General
René A. Chacón
Supervising Deputy Attorney General
NanetteWinaker
Deputy Attorney General


A136120, *People v. Johnson*
A136124, *People v. Thornton*