Filed 12/26/24
See concurring opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B330830 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. GA059207 |
| FREDY CORDERO GUDIEL, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Fredy Cordero Gudiel, convicted of second degree murder, filed a petition for resentencing under Penal Code[1] section 1172.6. After an evidentiary hearing, the trial court denied the petition. We affirm.

## FACTS

Gudiel, William Torres, and Pedro Pena were members of the West Side Locos gang. On October 6, 2004, Edgar Babayan and William Torres were hanging out in Pelanconi Park in Glendale. Gudiel called and asked to be picked up at his girlfriend's house; he was having a bit of trouble with some guys. Gudiel's girlfriend lived in the area belonging to the Toonerville gang. The West Side Locos and Toonerville gangs do not get along.

After receiving Gudiel's call, Babayan, Torres and Pena, who had joined them, set off in Torres's car. Torres was driving, Pena was in the front passenger seat and Babayan was sitting behind Pena. Gudiel was in the back seat with Babayan. Babayan testified he saw a wooden Dodger mini-bat and a duffle bag on the back seat of the car. He also saw an aluminum bat outside the car during the altercation, which was then brought into the car after the altercation.

Babayan was a bit concerned that they were headed into Toonerville territory. About three or four minutes after they

---

[1] Undesignated statutory references are to the Penal Code.

On January 31, 2024, we granted Gudiel's request for judicial notice of the record on appeal, which includes the trial transcripts and jury instructions.

2

picked up Gudiel they saw the murder victim, William Maldonado, riding a bicycle in the opposite direction.

Torres made a U-turn and pulled up to Maldonado. From the front seat, either he or Pena shouted: "Where are you from?" This means "What gang do you claim." Maldonado replied "Toonerville," stopped his bike, and reached towards his backpack.

Torres and Pena got out of the car, followed by Gudiel. Pena hit Maldonado on the head and shoulder with a bat, knocking him off the bike. Torres hit him with the Dodger mini-bat, causing that bat to shatter. As Maldonado tried to get up, Gudiel hit him in the face, twice on the chest, and then kicked him in the stomach. As Maldonado lay on the ground trying to protect his head, Gudiel picked up Maldonado's bike and threw it at him. One of the bike's tires hit Maldonado's leg and the rest of it landed on top of his body. Gudiel threw the bike only once because it was "too heavy." Maldonado was screaming in pain and bleeding. According to Babayan, who testified at trial, "[H]e had blood all over him."

Later that day, Maldonado was taken to a hospital. Maldonado sustained three injuries to his head. He died four days later of blunt head trauma. The fatal injury was behind the left ear, which was caused by the impact of "some blunt object against the scalp."

When interviewed by the police, Gudiel explained Maldonado was attacked because "he claimed Toonerville" and was therefore an "enemy." Appellant acknowledged that when he joined the gang, he knew he would have to kill a rival gang member. He conceded it was "stupid" to do that but "[t]hat's how it is in . . . a gang."

3

# PROCEDURAL HISTORY

On July 24, 2007, a jury convicted Gudiel of second degree murder and found the offense was committed for the benefit of a criminal street gang. Gudiel was sentenced to a term of 15 years to life in prison. We affirmed his conviction in full. (*People v. Gudiel et al.* (July 10, 2009, B201995) [nonpub. opn.].)

On January 10, 2022, Gudiel filed a petition for resentencing under section 1170.95. (§ 1170.95 is now codified as § 1172.6.) The trial court appointed counsel and ordered the People to file a response to the petition. The People's response was filed on June 17, 2022.

There is no transcript in our record that establishes when or if the court found Gudiel had made out a prima facie case and issued an order to show cause, which are prerequisites to an evidentiary hearing. At a hearing on October 13, 2022, the trial court set November 17, 2022 as the "date for a possible prima facie hearing." The trial court noted that "there has to be something special to show that somehow malice was imputed to the defendant, despite the fact no jury instructions were given. Otherwise I'm prepared to summarily deny the petition."

We have no transcript from November 17, 2022. During a hearing on February 6, 2023, the court asked counsel about the status of the petition and stated: "I'm kind of heading, that this is an implied malice murder case." It then observed that defense counsel "thinks we've already done the prima facie and we've moved to an OSC. Is that not correct? I don't have an independent memory." The court's judicial assistant then advised the court that the hearing today was "for an OSC setting." The trial court responded: "Then apparently I did rule

4

that it passed the prima facie phase." The trial court proceeded as if it had made such a finding. No party objected.

On May 5, 2023, the trial court held an evidentiary hearing. The court considered the record of conviction, which included jury instructions and a transcript of the initial trial. No new evidence was offered by either party. The People argued that there were three weapons involved: a souvenir Dodger baseball bat, another baseball bat, and a bicycle. The victim died from one of three, or all three combined, wounds to his head. The People cited Gudiel's statement that while the others were beating the victim with the bats, the victim was on the ground trying to get up. "And then, you know, I went over there and I hit him, hit him in the face, hit him twice toward his chest then in the stomach." "Whenever I got out of the car, I didn't have shit on me. I didn't have fucking no weapons or nothing. So I started—I started kicking him, and I socked him about three times. And then, fucking that's when I was like, man, fuck this. I lifted up the bike and threw it and it hit him like his body somewhere." Gudiel confirmed that he threw the bike on the victim when the victim was on the ground. The People argued Gudiel's role was to keep the victim on the ground while the others used deadly weapons on him. Gudiel had also told detectives that as a member of the gang, "If we see each other, we're going to want to kill each other."

Relying on the testimony of the gang expert, Gudiel argued that the assault was a "hit up," that is, an encounter between rival gang members that typically does not end up in any type of altercation other than a fistfight. The trial court denied the petition, finding that Gudiel aided and abetted an implied malice murder because a perpetrator committed the life-endangering act

5

of hitting Maldonado on the head with a baseball bat; Gudiel knew the perpetrator intended to commit that act; and Gudiel specifically intended to aid and abet the perpetrator's commission of the act.[2]

After argument, the trial court stated: "This is the court's decision: The first thing I'm going to indicate is that although I was taken through a series of cases involving felony murder, I do not think the felony murder cases involving [*People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522] apply to this case, and so I'm not going to apply them, because there is no indication that they should be applied.

"The situation is that, while I also, I guess, factually disagree with counsel, that we actually know what caused the blunt—we don't know what caused the blunt head trauma.  It's very possible that the head injury, the blow to the head—because the coroner, he said things were possible—could have actually been caused by the bike being thrown on his body, and it could have been the bike that hit him in the head, so I don't really know exactly where you're coming from, that it's absolutely clear that the baseball bat . . . I will indicate that I believe one of the co-defendants indicated he hit him in the head with the bat.

"[¶] . . . [¶]

"Also, in describing this blow to the head, they said it was similar to a skull fracture that you would see in a high speed traffic collision.  So if it was the bats that caused it, and he saw

---

[2]     The trial court made other findings which we need not consider in light of our conclusion that substantial evidence supports the finding that Gudiel aided and abetted an implied malice murder.

this person on the ground with this injury from the bat hitting him in the head so hard that it was like being in a high speed traffic accident, he had to know that it was dangerous to do anything further to this guy.

"He also had to know that his co-defendants—you did articulate that he didn't know his co-defendants were going to do this dangerous thing. Well, they exited the car with bats, and they hit this guy with incredible force, threw him off the bike, hit him with bats, and he was a witness to this, because he comes in at the end of the situation. So I disagree again with the argument that he didn't know that his co-defendants were violent and they were going to do this thing, because he actually saw them do it.

"Gudiel admits throwing the bike on Maldonado, that it hit Maldonado's body, and he only threw it once because it was so heavy, so that suggests that that is a pretty dangerous act, to throw a huge heavy bike on somebody while they're on the ground bleeding and having been hit in the head.

"He also said he hit him in his face while he was on his back. And as pointed out by the D.A., and I have in my notes, he was screaming in pain and he was bleeding. I also note that someone said, and I guess it was Gudiel, that the bike landed on the top of his body.

"So I believe that Gudiel did act with conscious disregard for life; he joined the defendants who were beating Maldonado, and his actual acts of punching the victim, throwing the bike, were, in fact, dangerous. He disregarded the danger.

"I disagree again with the defense, that I'm not to consider that he said, that as part of his loyalty or allegiance or his gang culture, that he had prepared himself for the possibility he would

7

have to kill a rival gang member. He wanted to be a, quote, rider, and not a punk. It's my obvious conclusion that 'rider' means someone who stands up for the gang and engages in this beating kind of activity.

"And then he said:

"I knew there was just a matter of time before I would end up in jail or dead.

"All of these statements, at least to the court, convey that he was willing to take those steps necessary to take out a rival gang member. So I wrote: 'These statements, coupled with the acts of Gudiel and the other defendants, convince the court beyond a reasonable doubt that Gudiel entered into the beat-down, either with the intent to kill or acted in conscious disregard for the life of the victim.'

"Now, I agree with you, there is no express malice, because nothing was said by him, and you can't just derive from the situation that they intended to kill him, but I disagree with you that the theory of implied murder malice has not been proven beyond a reasonable doubt.

"So I have concluded that the petitioner knew his companions intended to commit a life endangering act. They had bats. They immediately jumped on the victim. Petitioner intended to aid them in the commission of that act, and did so by punching the victim and throwing a heavy bike on him.

"He knew the act was dangerous to life because the victim was screaming in pain and bleeding. And petitioner disregarded the risk he entered in.

"[¶] . . . [¶]

"[Gudiel] saw and heard this individual, Maldonado, being hit with baseball bats by two of his friends, and he saw this

8

person fall to the floor. He saw him full of blood. He saw him screaming in pain, and with all that, he joined in the melee, and, therefore, he disregarded the risk to the life of Maldonado."

The court concluded: "I want to further indicate that the most significant argument that you made was that the defendant was 18. I am required by law to consider that factor. I'm supposed to decide whether his youth was such that he couldn't sort of engage in the findings, a conscious disregard for life and so forth, and understand what he was doing. I'm unable to make— I'm unable to find that the youth shows that he could not entertain the requirements of implied malice. There's too many facts here that show he should have or he did know what was going on, the screaming in pain, the fact of all the things he saw the other people do to this individual; I believe he had to know that his actions were in conscious disregard for life, that he had to know that he was joining in the actions of his partners who were engaging in endangering acts. And so although I considered the youthful factors and the fact that someone doesn't have the same maturity, the same judgment and so forth . . . .

"The youth aspect is not enough to convince this court that the defendant did not understand what he was doing and that I should somehow change the result because of his youth.

"I believe he specifically intended to aid and abet his perpetrators in committing the life endangering act. He knew the commission of a life endangering act was dangerous to human life, and I make all of those findings.

"[¶] . . . [¶]

"[I] believe the defendant thought he was carrying out his mission in life; he was standing up for his gang, and if it involved killing someone from a rival gang, he would do it. It's possible

that they didn't intend to kill him, but their actions, again, meet the requirements of implied malice.

"I believe the People have produced a valid theory, and I'm denying the petition for that reason."

This appeal followed.

## DISCUSSION

### A.    *Senate Bill No. 1437*

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) amended "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  It accomplished this by amending sections 188 and 189.  (Stats. 2018, ch. 1015, §§ 2, 3; *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)

Senate Bill 1437 also created former section 1170.95 (now codified as section 1172.6), which set out a procedure by which defendants convicted of murder under prior law may petition for resentencing if they believe they could not be convicted of that crime after the amendments to sections 188 and 189.  (Stats. 2018, ch. 1015, § 4.)  Petitions under section 1172.6 address convictions where a defendant was not the killer but was held vicariously liable on one of several theories of liability identified in the statute.  (*Lewis*, *supra*, 11 Cal.5th at pp. 957, 967.)

Once a petition is filed, after appointment of counsel and briefing, the trial court assesses whether petitioner has made a prima facie case for relief.  The prima facie inquiry is limited: the

court, accepting the petitioner's factual allegations as true, makes a " ' "preliminary assessment" ' " whether the petitioner would be entitled to relief if those allegations were proven. (*Lewis*, *supra*, 11 Cal.5th at p. 971.)  In assessing whether a defendant has made a prima facie case, the trial court is entitled to review the record of conviction, which includes the jury summations, jury instructions, verdict forms, and prior appellate opinions.  (*Id.* at pp. 971–972; *People v. Lopez* (2022) 78 Cal.App.5th 1, 13 (*Lopez*).)  Although appellate opinions are generally considered part of the record of conviction, the prima facie bar was intentionally set very low and the probative value of an appellate opinion is case specific; a trial court may not engage in " 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis*, at p. 972.)

If the record establishes ineligibility for resentencing as a matter of law, the petition is properly denied at the prima facie stage.  (*Lewis*, *supra*, 11 Cal.5th at pp. 970–972.)  However, the petition and record must establish conclusively that the defendant is ineligible for relief.  (*Lopez*, *supra*, 78 Cal.App.5th at p. 14.)[3]

At an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3), the trial court sits as an independent factfinder and determines whether the People have established

---

[3]     The People contend the trial court improperly found that a prima facie case had been made.  The People have provided no record on this issue and never raised this objection at the trial court.  Given our conclusion that substantial evidence supports the trial court's finding that Gudiel aided and abetted an implied malice second degree murder, we find it unnecessary to reach the issue.

11

the defendant's guilt beyond a reasonable doubt.  We review the trial court's factual findings at a section 1172.6 evidentiary hearing for substantial evidence.  (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.)  In conducting this review, we must consider the whole record in the light most favorable to the judgment below.  (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)  And "we presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence, whether direct or circumstantial."  (*Mitchell*, at p. 591; accord, *Brooks*, at pp. 57–58.)

B.     *Implied Malice Second Degree Murder*

California law recognizes three theories of second degree murder.  These theories are: (1) unpremeditated murder with express malice; (2) implied malice second degree murder; and (3) second degree felony murder.  (*People v. Swain* (1996) 12 Cal.4th 593, 601 (*Swain*).)  The case before us is one of implied malice second degree murder.

"Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' "  (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)  Under an implied malice theory of second degree murder, "the requisite mental state for murder—malice aforethought—is by definition 'implied,' as a matter of law, from the specific intent to do some act dangerous to human life *together with the circumstance that a killing has resulted from the doing of such act.*"  (*Swain, supra,* 12 Cal.4th at p. 603; *People v. Gentile* (2020) 10 Cal.5th 830, 850 (*Gentile*) [a person without an express intent to aid a killing "can

still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life"].)  Second degree implied malice murder remains valid notwithstanding the recent changes effected by Senate Bill 1437 and Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775).  (*Gentile*, at p. 850.)

Aiding and abetting an implied malice murder also remains valid notwithstanding the changes effected by Senate Bill 1437 and Senate Bill 775.  (*Gentile*, *supra*, 10 Cal.5th at p. 850.)  The court in *People v. Powell* (2021) 63 Cal.App.5th 689 explained the elements as follows: "[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.  [Citation.]  In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Powell*, at pp. 712–713, fn. omitted.)

C.   *Analysis*

Gudiel argues the evidence "does not support the court's conclusion that the throwing of the bike onto Maldonado's body was a proximate cause of his death."  He argues that his act of throwing the bike must be proven as a " ' "substantial factor

13

contributing to" ' " death and not " ' "merely theoretical" ' " or insignificant. (*Reyes*, *supra*, 14 Cal.5th at p. 988.) Gudiel strongly disputes that it was the bike that caused the blunt force trauma that was the cause of death. The short answer to this is that throwing the bike in and of itself need not be the actual cause of Maldonado's death. It suffices that Gudiel knew he was aiding in a life-endangering attack by the bat-wielding perpetrators that caused the victim to bleed profusely, knew dangerous weapons, baseball bats, were being used against Maldonado, and intended to stop Maldonado from escaping or defending himself by incapacitating him further by punching and kicking him and throwing the heavy bike on him as he lay prone on the ground. Ensuring Maldonado was unable to escape or defend himself helped the perpetrators complete their assault. (*People v. Schell* (2022) 84 Cal.App.5th 437, 443 [one of at least eight gang members who participated in a vicious assault upon the victim but who did not necessarily strike the fatal blow guilty of second degree implied malice murder].) The evidence before the trial court supports its finding that Gudiel knew his codefendants, when they exited the car with baseball bats, intended to commit life-threatening violence on the victim, saw them beating the victim with those bats, and, with conscious disregard for Maldonado's life, intended to aid the violence by punching and kicking the victim and then throwing the heavy bicycle on him as he lay prone on the ground, bleeding profusely and screaming in pain.

Appellant contends the trial court should have applied *People v. Clark*, *supra*, 63 Cal.4th 522, because "reckless indifference to human life" under section 190.2, subdivision (d), is

"similar" to the conscious disregard for human life that is the critical element of second degree murder.  We do not agree.

These concepts have been separately and distinctly analyzed and applied in our jurisprudence for decades.  "Reckless indifference" is a finding necessary for death penalty eligibility in felony murder cases.  "Conscious disregard" is an element of the crime of aiding and abetting an implied malice second degree murder.  Each has its own function and purpose.

As the People point out, the reckless indifference standard for felony murder special circumstances is qualitatively different than the conscious disregard standard for implied malice second degree murder.  The reckless indifference standard actually requires a subjective awareness of a higher degree of risk than the conscious disregard for human life standard.  (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 126, fn. 2; *People v. Underwood* (2024) 99 Cal.App.5th 303, 317; *People v. Johnson* (2016) 243 Cal.App.4th 1247, 1285.)  That is reason enough not to combine them into one analytical framework.  The trial court did not err in refusing the invitation to apply *Clark*.  We decline the invitation as well.

## DISPOSITION

The order denying the petition for resentencing is affirmed.

**CERTIFIED FOR PUBLICATION**


                                        STRATTON, P. J.

I concur:



        VIRAMONTES, J.

**WILEY, J., Concurring.**

I join in the majority result and opinion, except for the final discussion of "reckless indifference to human life" and "conscious disregard for human life." This final discussion suggests these phrases have *different* meanings.

In my view, these phrases have the *same* meaning: *conscious disregard for human life* is equivalent to *reckless indifference to human life*.

When explaining the latter phrase, our Supreme Court used the words of the former phrase: "conscious disregard." (*People v. Clark* (2016) 63 Cal.4th 522, 617 (*Clark*).) When the same words define two phrases, this suggests the two phrases have the same meaning.

Both phrases expound the same core concept: recklessness.

Many acts satisfy *both* phrases. (Cf. *People v. Knoller* (2007) 41 Cal.4th 139, 158 [owner consciously decided to bring a vicious unmuzzled 150-pound dog into contact with other people, knowing that the dog was aggressive and highly dangerous and that the owner could not control the dog]; *Commonwealth v. Malone* (Pa. 1946) 47 A.2d 445, 447-449 [affirming reckless murder conviction for a Russian roulette killing where the shooter pointed the gun at a consenting friend].)

I have yet to learn of an example, however, where someone identifies conduct that would satisfy one phrase but not the other. I doubt there is such an example. Absent a concrete example, it is hard to see any practical difference between *conscious disregard for human life* and *reckless indifference to human life*.

1

The *Clark* decision built the Model Penal Code's definition of recklessness into California state law. (*Clark, supra,* 63 Cal.4th at p. 617 & fn.73.)

The trial court's analysis in this case satisfied *Clark*. Gudiel acted with *reckless indifference to human life*. In other words, he acted with *conscious disregard for human life*. Under *Clark*, the trial court was right to deny Gudiel's petition. (See *Clark, supra,* 63 Cal.4th at pp. 614-623.)

Gudiel displayed a high level of participation. (See *Clark, supra,* 63 Cal.4th at p. 615 [the greater the participation, the more likely that defendant acted with reckless indifference to human life].)

Gudiel saw two fellow gang members knocking Maldonado to the ground and beating him with bats. The blows were full force: one bat shattered when it hit Maldonado's head. Maldonado was screaming with pain. Gudiel joined the violent assault and began kicking and punching Maldonado to keep him on the ground. Gudiel sought to maximize the risk of violence to Maldonado. Rather than restrain the attack or aid the victim, Gudiel searched for a weapon. He chose Maldonado's bicycle, which Gudiel said was so heavy that he could lift it and throw it onto Maldonado only once.

The beating continued until Maldonado "had blood all over him" and the injuries were so severe as to cause his death. The 15-to-20 second duration of the attack did not reduce its recklessness. Gudiel saw they were using clubs to the head. He joined in with unbridled force and did his best to improvise a weapon from materials at hand.

Gudiel knew his fellow gang members' propensity for violence against rival gang members. His attitude was that,

when he joined the gang, he knew he would have to kill a rival gang member.  He said "[t]hat's how it is" in a gang.

In one lone sentence, the trial court said it saw no need to apply the *Clark* case.

That one sentence might have been error, but any assumed error was harmless.  The trial court effectively *did* apply the *Clark* decision.

I disagree with the last three substantive paragraphs of the majority opinion, but we reach the same ultimate destination by different roads:  we must affirm the order.


WILEY, J.